Dorothy HINCHCLIFF, individually and as Executrix of the Estate of Alfred W. Hinchcliff, deceased, Plaintiff,

v.

James M. CLARKE, Internal Revenue Agent

and

Melvin J. Burton, District Director of Internal Revenue, Defendants.

Civ. A. No. 37102.

United States District Court
N. D. Ohio, E. D.

Aug. 1, 1963.

See, also, D.C., 205 F.Supp. 1.

William Patrick Clyne, Cleveland, Ohio, for plaintiff.

Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, for defendant.

KALBFLEISCH, District Judge.

This matter is before the Court upon the application of the United States of America for an order to enforce the summons served upon Donald J. Graf by James M. Clarke, Internal Revenue Agent, pursuant to the provisions of Section 7602, Title 26 U.S.C.A., and upon the motion of Dorothy Hinchcliff, individually, and as executrix of the estate of Alfred W. Hinchcliff, deceased, intervenor herein, to quash and vacate said summons served upon Donald J. Graf, as the same appears upon the Commissioner's Docket No. 12, Case No. 4325. Also before the Court are (1) the complaint of Dorothy Hinchcliff, individually, and as executrix of the estate of Alfred W. Hinchcliff, deceased, praying for an order restraining the defendants, James M. Clarke, Internal Revenue Agent, and Melvin J. Burton, District Director of Internal Revenue, their successors, deputies, agents and employees, and all persons acting through or under them, from further prosecution of the investigation of the income tax matters of the plaintiff, individually, and of the estate of plaintiff's deceased husband, Alfred W. Hinchcliff, restraining the defendants from gaining access to summonsed records and quashing a summons served upon Donald J. Graf; (2) the order of this Court, dated November 27, 1961, "that James M. Clarke appear and produce certain documents, records, memoranda and papers"; and (3) the motion of the defendants for an order requiring production of the documents set forth in the original summons to Graf, as well as the supplemental summons served upon Dorothy Hinchcliff on November 8, 1962, subsequent to the

reopening letter which was served upon Dorothy Hinchcliff on October 2, 1962.

Alfred W. Hinchcliff and Dorothy Hinchcliff, as husband and wife, filed joint income tax returns for the years 1946 through 1959. Alfred W. Hinchcliff died on May 31, 1959, and Dorothy Hinchcliff was duly appointed executrix of the estate of Alfred W. Hinchcliff on June 16, 1959. Dorothy Hinchcliff, individually, and as executrix of the estate of Alfred W. Hinchcliff, deceased, will hereafter be referred to as the taxpayers.

Donald Graf, in 1951 and for some period prior thereto, was a self-employed public accountant, and in 1951 he was employed by Alfred W. Hinchcliff to prepare and file the taxpayers' income tax returns and to help them with other accounting matters. In 1951, Mr. Graf passed the required examination, and received his certificate as a certified public accountant in January of 1952.

Mr. Graf, hereinafter referred to as the accountant, supervised the bookkeeping and accounting procedures and the preparation and filing of income tax returns for the taxpayers for the calendar years beginning 1950 through the calendar year 1959. At the time the taxpayers employed the accountant they placed in his possession copies of their income tax returns for the years 1946, 1947, 1948 and, later, a photograph of the return for 1949, and other data. In some instances, the accountant would receive information and data as to income and expenditures directly from the taxpayers; in other instances, the accountant would collect this information from others, such as the information and data which he obtained from Norma Mantey, the bookkeeper at the Hinchcliff apartments. (TR–88, Jan. 3, 1963.) The accountant would assemble the information from cancelled checks, as well as from dividend income and deposit slips, and from that information he prepared the tax returns for the taxpayers. In referring to the work he performed, Mr. Graf identified himself as the auditor for Mrs. Hinchcliff and the Hinchcliff estate.

In March of 1961, James M. Clarke, an Internal Revenue agent, hereinafter referred to as the agent, began an examination of the 1957, 1958 and 1959 income tax returns filed by Alfred W. and Dorothy Hinchcliff to determine their correctness. (TR–46, Jan. 3, 1963.) The agent conversed with the accountant at various times in the months of March, April and the first half of May of 1961. In the course of these conversations, the agent informed the accountant that the examination involved the taxpayers' understatement of income from rental property, and the agent requested the accountant's permission to examine not only the accountant's records and data pertaining to the current open years but also his records for closed years prior to 1957. The accountant discussed this request with the taxpayers' attorney and was advised by the attorney to grant the request as to current open years but to refuse the request as to closed years.

On May 3, 1961, sixteen days prior to the issuance of the summons, the accountant permitted the agent to examine certain records in his possession, some of which were records owned by the taxpayers, particularly the income tax returns of the taxpayers for the years 1946, 1947, 1948 and 1949, and on the same date the accountant further permitted the agent to take such records and data to the Internal Revenue Office to have them photographed. (TR–45, Jan. 3, 1963.) The original documents and data photographed by the agent were returned to the accountant and the photographic copies have been identified and admitted as "Government's Exhibit No. 1 in Contempt Proceeding."

Thereafter, further conversations relative to documents and data of closed years occurred between the agent and the accountant and between the accountant and taxpayers' attorney. As a result of the objections of the taxpayers' attorney, the agent visited the office of the accountant on May 19, 1961, and on that occasion the agent and the accountant placed in boxes, which they then sealed, all of the records and data pertaining to the taxpayers

which were at that time in the possession of the accountant. The agent, on the same date, May 19, 1961, at 2:39 P.M., executed and served upon the accountant a summons requiring the accountant to appear before James M. Clarke (the agent) at 2:30 P.M. on May 19, 1961, at the accountant's office, to give testimony relating to the tax liability of Alfred W. and Dorothy Hinchcliff and to bring with him and produce for examination "all books, records, work papers, and files pertaining to the above-named taxpayers. These records should include all net worth statements, financial statements, and profit and loss statements, certified or not." After the accountant and the agent had sealed in boxes all of the aforesaid pertinent documents, the accountant retained the sealed boxes in his possession.

On May 24, 1961, the agent and an Assistant United States Attorney appeared before United States Commissioner Herbert A. Horn and filed an application for an order of attachment against Donald J. Graf, under and by virtue of Sections 7602, 7603 and 7604 of Title 26 of the United States Code. This proceeding before the United States Commissioner was docketed as Case No. 4325 of Commissioner's Docket 12. On the same date, the accountant not being present but being represented by counsel, the Commissioner examined the agent who testified that the aforementioned summons was served on Mr. Graf on the 19th day of May, 1961, and that Mr. Graf had refused to turn over the documents for examination at the time the summons was served upon him. The Commissioner found that the Government was entitled to a writ of attachment; ordered that the documents sought be impounded; and that the accountant be restrained from dispossessing himself of said documents. The writ of attachment directed the accountant to appear before the Commissioner on June 2, 1961, at 2:00 P.M., to show cause why he should not be found in contempt. This show cause hearing was postponed until June 13, 1961. On June 13, 1961, the accountant filed a mo-

tion to quash and vacate the order of attachment, the order to impound, and the writ of attachment, for the reason that the summons as served did not comply with Section 7605(a) of Title 26 of the United States Code in that it failed to give the accountant ten days in which to appear before the agent or to produce the documents summonsed. This motion to quash was assigned for hearing on June 23, 1961, on which date the Commissioner overruled the motion. On June 23, 1961, a motion to quash and vacate the summons was filed on behalf of the taxpayers; however, the Commissioner refused to accept such motion for filing and the case was then passed to July 10, 1961. On July 10, 1961, the Commissioner vacated his order of June 23, 1961, wherein he overruled the motion to quash filed by the accountant, and the case was continued to July 31, 1961.

A few days prior to July 31, 1961, a dispute arose between the accountant and the taxpayers, which resulted in the accountant's informing the taxpayers that he was withdrawing and dismissing his motion to quash and declaring that he would comply with the summons by delivering to the agent the documents and data summonsed.

On July 31, 1961, and prior to the hour when the action was to proceed before the United States Commissioner, the taxpayers filed their complaint in the United States District Court (Civil No. 37102) seeking a temporary restraining order, a preliminary injunction, and a permanent injunction restraining the agent and the Director of Internal Revenue from further prosecuting the action pending before the United States Commissioner. A temporary restraining order was granted by the Court, and the proceeding before the United States Commissioner was passed until August 11, 1961, and then to August 18, 1961. On August 18, 1961, this Court adjudged that the Commissioner should proceed in accord with the Court's memorandum reported in 205 F.Supp. 1. On August 28, 1961, the taxpayers filed a motion for leave to intervene in the case before the United

States Commissioner, and the Commissioner passed the case to September 1, 1961. On September 1, 1961, the Commissioner, having found that the taxpayers did own some of the documents sought to be examined, allowed the taxpayers' motion to intervene; whereupon, the taxpayers filed a motion to quash the summons that was issued and served on the accountant, and the case again was passed by the Commissioner to September 6, 1961. On September 1, 1961, the accountant requested the withdrawal of his motion to quash the summons and to vacate the writ of attachment which he had filed on June 13, 1961. The Commissioner granted the accountant's request.

On September 7, 1961, an issue arose as to the ownership of the various documents which the Commissioner had ordered impounded, and the Commissioner continued the case to October 3, 1961, in order to permit the Commissioner to mark for identification each of these documents. Between September 7, 1961, and October 3, 1961, the Commissioner had stamped and numbered each impounded document, there being a total of 386 documents. On October 3, 5 and 9, 1961, the accountant was called as a witness and testified as to each identified document, stating where he had received it, from whom, and for what purpose he had used the document.

■ The testimony of the agent relating to his assignment to examine into the tax liability of the taxpayers for the years 1957, 1958 and 1959, and his testimony as to the documents, data and files which he was permitted to examine and copy, is bound separately and identified on the cover page as follows: "Testimony of James M. Clarke * * * taken at the trial of the above-entitled cause, before Commissioner Herbert A. Horn. Taken on September 6 and 7, 1961." The testimony of the accountant identifying the documents and data which he and the agent sealed in boxes after the agent had been permitted to examine them and to make copies of some of them is contained in a separate binding, upon the cover page of which is the following: "Testimony of Donald J. Graf, taken at the trial of the above-entitled cause, before Commissioner Herbert A. Horn. Taken on October 3, 5 and 9, 1961." There is not the slightest doubt that the testimony of the accountant and the agent clearly establishes that prior to the issuance of the summons the agent examined all and copied some of the documents and data which are the property of the taxpayers, and further clearly establishes that the summons sought the production of documents of the taxpayers, which documents clearly come within the limitations of Section 7605(a) and (b) of Title 26 U.S.C.A. From this testimony, and particularly from comments of Bert W. Griffin, the Assistant United States Attorney who conducted the examination, it is evident that the Government was laboring under the theory that if the evidence would disclose that the accountant in some manner used property of the taxpayers in preparing his work sheets and the tax returns, such use by the accountant made available to the Government, without a compliance with Section 7605(a) and (b) of Title 26 U.S.C.A., all property of the taxpayers which was so used. This theory apparently rests on the assumption that the taxpayers waived whatever rights they otherwise would be entitled to assert, when they allowed the accountant to take into his possession the documents in question. This theory the Court rejects.

The United States Commissioner and counsel for the parties herein devoted many hours of trial time in an endeavor to determine the ownership of each document that was impounded. However, following the taking of testimony on October 3, 5 and 9, 1961, the proceeding before the Commissioner became so involved in disputes between counsel and in arguments over procedure that on October 9, 1961, the case was continued until November 15, 1961. On November 15, 1961, counsel for the taxpayers caused a subpoena duces tecum to be issued and served on the agent, requiring

him to appear and to bring with him all of the photographs of the documents and data which he had received from the accountant, together with any and all copies and memoranda prepared by the agent, or by the Internal Revenue Service, pertaining to the material which he had received from the accountant.

The agent appeared in response to the subpoena, but did not otherwise comply with the subpoena. At this point, the Commissioner expressed concern as to whether he had the power to cite the agent for contempt for failure to obey the subpoena. The Commissioner continued the case to the next day, at which time the taxpayers filed a motion for production, inspection and copying of documents of the type and nature described in the subpoena. The Commissioner again continued the matter to the following day, November 17, 1961. On November 17, 1961, the Commissioner overruled the motion of the taxpayers for production of documents and continued the case to November 20, 1961.

On November 20, 1961, under cross examination, the agent testified that he had received the subpoena (Intervenor's Exhibit B) but that he did not bring with him the documents subpoenaed. The agent admitted that he had photographed the tax returns of the taxpayers for the years 1945, 1946, 1947, 1948, 1949, 1950, 1951, 1952 and 1953, and that he had taken and photographed one page of work sheet for each of the years 1951, 1952, 1953, 1954, 1955, 1956, 1957 and 1958, and that he had also photographed Internal Revenue Agent Reports for the years 1948, 1949, 1950, 1951, 1952 and 1953, which he had received from the accountant. By reason of the decision and judgment of the Court, which appear in the conclusions of law, no useful purpose will be served by a separate finding as to ownership of each exhibit.

Due to the rulings of the Commissioner on the taxpayers' motion for production of documents, and the failure of the Commissioner to rule upon the subpoena duces tecum, the taxpayers applied to this Court on November 20, 1961, in Civil Action No. 37102, for an order requiring the agent's obedience to the subpoena. A show cause order was directed to the agent on November 21, 1961, and an oral hearing upon the application was concluded on November 22, 1961. On November 27, 1961, this Court issued an order directing the agent to comply with the subpoena duces tecum on a date to be determined by the United States Commissioner. Fifteen days later the Government moved to vacate or amend the order of November 27, 1961, which motion was overruled for the reason that the same was not timely filed under the Federal Rules of Civil Procedure.

The Court will now digress to comment on one facet of the proceedings thus far. Mr. Griffin, the Assistant United States Attorney who, until his recent resignation, represented the Government in this cause, elected to apply to the United States Commissioner for enforcement of the summons under Section 7604 (b), Title 26, U.S.C.A., instead of making his application to a Judge of the District Court. The events which transpired before the Commissioner compel the Court to strongly recommend that in the future the United States Attorney make such applications to a United States District Judge.

On December 27, 1961, the United States Commissioner applied for permission to certify and transfer the proceedings to this Court. Upon consideration of said application and the briefs and arguments of counsel, the Court, on March 20, 1962, sustained the Commissioner's application and ordered that the proceedings before the United States Commissioner be certified and transferred to this Court and that the same be consolidated with Civil Action No. 37102. On May 1, 1962, the transcript and original record of the proceedings before the United States Commissioner were filed.

On January 3, 1963, this cause came on to be heard and was finally submitted at the conclusion of the testimony of James M. Clarke, the agent, Donald J. Graf, the accountant, Dorothy Hinch-

cliff, and Henry W. Rosewater. At that time the agent produced and gave testimony upon certain documents which were identified as "Government's Exhibit No. 1 in Contempt Proceeding." This exhibit contained the documents and data which the agent stated the accountant permitted him to take and photograph prior to May 19, 1961. From the evidence adduced in this Court, one significant fact was developed, that is, that prior to and including May 19, 1961, the agent pursued a course of action which he knew, or should have known, was partially if not wholly illegal, and that he did so with complete disregard of his duty to ascertain the propriety or legality of his actions. In support of this finding, the Court cites the testimony of the accountant and the agent as to their conversations during the period of time mentioned, and particularly that part of their conversations which had to do with the objections of the taxpayers' lawyer to an examination of records of closed years.

## CONCLUSIONS OF LAW

There are two classes of papers involved in this case. The first class is composed of those documents which record the business and tax affairs of the taxpayers for the years 1945 to 1956, which the taxpayers or their employees turned over to the accountant during that period. The second class is composed of the work papers and memoranda made by the accountant when he was preparing tax returns and doing accounting work for the taxpayers.

■ The agent's examination and photographing of the papers in the first classification, prior to May 19, 1961, as well as the agent's examination of such papers in the course of the proceedings before the United States Commissioner, was improper and illegal because the taxpayers had not been served with a reopening letter as is required by Section 7605(b) of Title 26, U.S.C.A. The Government's application for an order enforcing the summons issued to the accountant, which was filed before the

United States Commissioner on May 24, 1961, is void and unenforceable because the summons did not meet the requirement of subsection (a) of Section 7605, Title 26 U.S.C.A. See Hubner v. Tucker, 245 F.2d 35, 39 (9th Cir., 1957). As a result of this illegal examination and photographing of the taxpayers' papers, the Government became possessed of evidence to which it had no rightful claim. The Government's illegal action presents the question of whether the Court should order the suppression of the illegally obtained evidence. The Government's action here was taken by a trained agent who knew or who must be charged with knowledge that he was acting in direct contravention of the statute. There was no need to instantly examine these records in order to preserve the evidence. The accountant had known for approximately two months that the tax liability of the taxpayers was under investigation. Whatever offense or deficiency the taxpayers might ultimately have been proved to have perpetrated, society's interest in such proof certainly would have been less compelling than in cases involving the apprehension of dangerous or violent criminals—situations which are in fact involved in most cases where evidence is suppressed. The Court will order the suppression of all of the evidence which the Government obtained from this illegal examination and copying of the taxpayers' property. Application of Leonardo, 208 F.Supp. 124 (N.D.Calif., 1962); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

■■ This Court, being a court of equity as well as a court of law, has the power to fashion an appropriate order which will achieve the ends of justice. With this power in mind and upon the facts in this case, it appears appropriate that in establishing the scope of the suppression order the Government should be forever barred from using all evidence illegally obtained in any proceeding of any kind, and should be further barred from reacquiring it by any means. "The essence of a provision forbidding the

acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, cited and approved in Nardone, et al. v. United States, 308 U.S. 338, 340, 60 S.Ct. 266, 84 L.Ed. 307 (1939). See the opinion of Mr. Justice Black in United States v. Wallace & Tiernan Co., 336 U.S. 793, 69 S.Ct. 824, 93 L.Ed. 1042 (1949), and the cases cited therein. See also Homan Mfg. Co. v. Russo, 233 F.2d 547 (7th Cir., 1956).

The Court believes this broad order is appropriate because, in accord with the established facts, where the evidence will continue to exist, a suppression order which merely required return of the illegally seized evidence, and allowed the Government to regain the same by later legal processes, would be a nearly futile gesture. It would create a precedent from which the Government might infer that if it acted illegally in future cases the greatest detriment it would suffer would be having to recommence its proceedings by a legal route, while if no objection were made the illegal action would stand and the Government would have lost nothing. The public policy condemning the invasion of personal rights is so strong that the Court can find no justification for any judgment or decision which would have the effect of establishing such a precedent.

The Government urges that its examination and copying of the papers in the second classification, that is, the work sheets and memoranda prepared by the accountant, were not illegal. In support of this contention the Government maintains that at all relevant times the accountant was working for the Hinchcliffs as an independent contractor, and that the papers which he compiled for his use in the course of his employment, as differentiated from the papers which were furnished him by the taxpayers and their agents, were the accountant's property and, being the accountant's property, the Government contends that the Internal Revenue Service was entitled to examine them without the benefit of a reopening letter or summons. As to the papers in the second classification, the Court will assume that this contention is correct, because the scope of the suppression order which the Court believes justice authorizes it to make creates a result no different than would be the case if these work sheets and memoranda were held to be the taxpayers' property.

█ If some of these papers did belong to the accountant, as the Government contends, that legal situation would be nothing more than a later happy fortuity for the Government. A judicial determination, subsequent to the agent's examination, which held that some of the papers were the accountant's property should not be allowed to validate part of the agent's actions when his general purpose, as determined from his acts, was to embark, with complete disregard of the statute, upon an inspection which he is charged with knowing to have been at least partly and possibly entirely illegal, while making no attempt to determine what if any part of it was proper.

By the nature of the accountant's services, the information contained in the work sheets and memoranda, which the Government contends belonged to the accountant, was the same information that was contained in the papers that unquestionably were the taxpayers' property; in fact, the work sheets and memoranda were of necessity compiled from the records that belonged to the taxpayers. Thus, if the Government is permitted to use the information contained in these work sheets and memoranda, although it is barred from using the information obtained from the records that belonged to the taxpayer, it is in effect barred from nothing and there would be no effective sanction imposed against it in spite of its illegal taking of the taxpayers' property.

█ By the above statement the Court does not mean to imply that because a defendant has been the victim of an il-

legal search, seizure or examination he should be granted immunity from a conviction based on independent evidence. Such a holding would be clearly erroneous. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). This is not a case where evidence was illegally obtained and other evidence, separable from it, was legally obtained. Rather, this is a case highly analogous to one in which "granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality * * * instead [of] by means sufficiently distinguishable to be purged of the primary taint." Wong Sun et al. v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963). This is because the papers which belonged to the taxpayers and the papers which the Government contends belong to the accountant are so nearly identical in nature, and the procurement of the one group of papers was so closely intertwined with the procurement of the other group as to make them all the fruit of the illegal photographing and examination.

Under the circumstances of this case, and in view of the statutory and constitutional policies which seek to protect citizens from such governmental invasions of their rights as occurred here, it appears appropriate that this Court, in the exercise of its equity powers, should fashion a suppression order of a scope which includes the permanent suppression of all of the evidence belonging to this second classification insofar as it is similar to or extracted from the papers which unquestionably were the taxpayers' property. See Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), where the court was moved by similar considerations. See also United States v. Coplon, 185 F.2d 629 (2nd Cir., 1950); United States v. Paroutian, 299 F.2d 486 (2nd Cir., 1962); and United States v. Lipshitz, 132 F.Supp. 519 (E.D.N.Y., 1955).

The same reasons which compel the Court to permanently suppress, in this and in all future proceedings, the evidence obtained from the taxpayers' records, compels also the similar permanent suppression of all evidence obtained from the papers which it contends belonged to the accountant, insofar as that evidence is similar to the information illegally obtained from the taxpayers.

This suppression order shall not preclude, or in any way interfere with any investigation, examination or other action which the Government may institute as to the tax liability of the taxpayers, except that in any such investigation, examination or other action none of the evidence herein ordered suppressed may be used, employed, offered, introduced or relied upon.

This Court further concludes that the exhibits identified and introduced in this cause shall be separated by counsel in accord with the testimony of the accountant, and that those documents and exhibits which were turned over to the accountant by the taxpayers and their employees shall be returned to the taxpayers, together with the exhibits contained in "Government's Exhibit No. 1 in Contempt Proceeding," and that the remainder of the exhibits shall be returned to the accountant.

The foregoing is adopted as findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

## MEMORANDUM ON RECONSIDERATION OF INJUNCTION

Taxpayers, Dorothy and Alfred W. Hinchcliff, had entrusted their business records covering the years 1946 through 1959 to their accountant, Donald Graf. Mr. Graf had been engaged by the taxpayers as an employee for purposes which included the preparation of income tax returns for some of those years.

In March of 1961 James M. Clarke, an Internal Revenue agent, began an examination of the 1957, 1958 and 1959 income tax returns of Alfred W. and Dorothy Hinchcliff. At various times during March, April and May of 1961, Agent Clarke conversed with the accountant

concerning the Hinchcliffs' tax returns. In the course of these conversations the agent informed the accountant that the examination involved the taxpayers' understatement of income, and the agent requested the accountant's permission to examine not only the records and data pertaining to the years 1957, 1958 and 1959, which previously had not been examined, but also to examine those for prior years, which had been subject to a former examination. The accountant, Graf, discussed this request with the taxpayers' attorney, and was ordered by the attorney to allow an inspection of the material for the years 1957, 1958 and 1959 but to refuse the requested authorization as to any prior years.

On May 3, 1961, Agent Clarke went to the accountant's office and there, in the presence of the accountant, proceeded to examine certain of the records, papers and documents pertaining to the Hinchcliffs' financial transactions. (Such records, papers and documents will hereafter be referred to simply as papers.) Some of the papers which the agent examined were owned by the accountant; others were owned by the taxpayers.

On that same date the agent removed many of those papers—including papers which were the property of the taxpayers pertaining to years before 1957—to the office of the Internal Revenue Service, and there examined and photographed them. At that time the agent was not armed with any summons or judicial or administrative process which authorized him to inspect or seize those papers. Sixteen days later the agent attempted to cure this defect by serving upon the accountant a summons requiring him to appear to testify and to produce the papers. As this Court found in its findings of fact and conclusions of law, filed on August 1, 1963, "the agent pursued a course of action which he knew, or should have known, was partially if not wholly illegal, and * * * he did so with complete disregard of his duty to ascertain the propriety or legality of his actions." (P. 10.)

In the memorandum filed on August 1, 1963, the Court found that the agent's actions were in violation of the statutory requirements and that a proper sanction would be the permanent suppression of all of the papers and records for the years prior to 1957, as well as of the information contained therein or acquired therefrom, which the agent, Clarke, took from the office of the accountant on May 3, 1961.

Following the filing of the August 1 memorandum, the Government moved for reconsideration and proceeded to raise many issues which had not been contested previously. The Court disapproves of an attempt to retry a case upon a motion for reconsideration; however, because of the seriousness of the contentions which have been raised for the first time, the Court feels obliged to entertain extensively certain additional questions.

Upon reconsideration, the Court finds, in addition to the findings of fact and conclusions of law which were filed on August 1, 1963, that the inspection, removal and copying of the taxpayers' papers which related to years prior to 1957 was an unconstitutional search and seizure of the taxpayers' property in violation of the Fourth Amendment of the United States Constitution.

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

It is not without reason that the prohibition against unreasonable searches and seizures was incorporated in the first ten amendments to the Constitution. The development of the body of law concerned with such searches and seizures can be traced back for centuries into the common and criminal law. For a résu-

mé of this development see Mr. Justice Bradley's classic opinion in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), in which he quoted with approval portions of Lord Camden's opinion in Entick v. Carrington and Three Other King's Messengers, reported in 19 Howell's State Trials 1029 (1765). Lord Camden, in turn, commented upon developments of the concept at the time of Lord Coke, which are reported in Coke's 4 Institutes 176.

The Fourth Amendment is the embodiment of those protections which, as Mr. Justice Bradley said:

" * * * affect the very essence of constitutional liberty and security. * * * they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, * * *. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within the condemnation of that judgment." Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

The United States Supreme Court, nearly thirty years later, gave further implementation to the sanctity of the Fourth Amendment in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). And again in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961), the Court reiterated the proposition that the security of one's privacy against arbitrary intrusion by the police is implicit in the concept of ordered liberty.

It is thus apparent that the rights secured to citizens by the Fourth Amendment are not limited to those which obviously flow from a narrow construction of the literal wording of that enactment, but include the rights of citizens to be free in their persons, papers, homes and offices from unwarranted and unreasonable intrusion by Government officials. The Fourth Amendment is, in short, the guarantee of a right to privacy. United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960).

A study of the cases reveals that in recent years the protection of the Fourth Amendment has most often been applied in instances where the property seized was either contraband or articles used in the commission of crimes. Rare has been the case—as our society has developed, and as the long arm of the Government has reached into the private affairs of life through the various regulatory agencies—when the right to privacy of papers has been asserted under the Fourth Amendment. Clearly that right today, in our industrial, closely regulated society, is not so great as it was in England when Lord Camden could say that the search for papers was, with one exception, unknown to that part of the criminal law which did not emanate from the Star Chamber. Yet even today we would do well to remember that our rights stem from a time when it was the belief, as Lord Camden said some twenty-five years before the drafting of our Constitution, that:

"Papers are the owner's goods and chattels; they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away the secret nature of those goods will be an aggravation of the trespass and demand more considerable damages in that respect." (Entick v. Carrington and Three Other King's Messengers, supra.)

It is apparent that if there is a hierarchy of sanctity according to which certain types of searches and seizures are more pernicious than others, the unreasonable search and seizure of a man's books and papers belongs in that category of wrongs most strongly condemned.

Turning now to the facts of this case, because the Fourth Amendment speaks in terms of criminal prosecutions and of warrants issued upon probable cause, the question immediately arises whether it applies to protect papers of a taxpayer, which pertain to his civil tax liability, from a search and seizure by a government which is attempting to determine that liability. The answer must be that it does.

The Court will assume, for present purposes, that the investigation undertaken by Agent Clarke was not conducted with a view toward criminal action against the taxpayers but was undertaken only for the purpose of determining their civil tax liability. Although the Fourth Amendment speaks in terms of criminal prosecutions only, where the Government is seeking to take private property in a civil tax action the shield of the Amendment's protection is no less available to the citizen than it would be in a criminal prosecution arising from the same facts. Any doubts as to this proposition were set at rest by Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

In Boyd the Government sought a forfeiture of property because of failure to pay taxes thereon. The action was instituted under a statute which required the taxpayer to produce certain books and papers which would pertain to his tax liability, and further provided that if he did not produce them allegations which the Government made concerning their contents should be taken as confessed. The Supreme Court declared that statute unconstitutional as being violative of the Fourth Amendment. It held that it was tantamount to compelling the production of such papers, and that such production, when sought for the purpose of taking

property under the tax statutes, "is within the scope of the fourth amendment to the constitution * * *." (116 U.S. p. 622, 6 S.Ct. p. 528.)

"Reverting then to the peculiar phraseology of this act, and to the information in the present case, which is founded on it, we have to deal with an act which expressly excludes criminal proceedings from its operation (though embracing civil suits for penalties and forfeitures), and with an information not technically a criminal proceeding, and neither, therefore, within the literal terms of the fifth amendment to the constitution any more than it is within the literal terms of the fourth. Does this relieve the proceedings or the law from being obnoxious to the prohibitions of either? We think not; we think they are within the spirit of both." (116 U.S. p. 633, 6 S.Ct. p. 534.)

The forfeiture sought in the Boyd case was a civil action highly analogous to a modern civil tax action which seeks to recover a deficiency assessment and possible civil fraud penalties. The Government admits that it seeks to institute such an action against Mrs. Hinchcliff.

The Court is not holding that in instances involving civil investigations a taxpayer's records may be examined only upon issuance of a warrant based upon probable cause. That part of the terminology of the Fourth Amendment which speaks of warrants is peculiarly applicable to criminal investigations but, in view of Boyd, the principle which the Fourth Amendment represents—the principle of the right to privacy and freedom from unwarranted governmental interference—is equally applicable in civil cases where property loss to the ciitzen is the object of the Government's efforts.

The question remains whether these documents and papers which were taken by Agent Clarke were taken in such a manner as to constitute an unreasonable search and seizure. The Court believes that they were.

■ It cannot be doubted that the taxpayer has standing to assert her constitutional privileges when the papers were seized not from her possession but from the possession of a bailee who was her employee. In many cases the Supreme Court has held that ownership of property confers upon the owner sufficient standing to object to its search and seizure. See, for instance, United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), and the comments in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Cf. Johnson v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913); and Dier v. Banton, 262 U.S. 147, 43 S.Ct. 533, 67 L.Ed. 915 (1923).

It cannot be doubted today that not only does an owner of property have standing to complain of the seizure of that property, but also that when books and papers which contain information which may lead to discovery of a crime—as distinguished from articles which are either instrumentalities of crime or contraband—are in the hands of an authorized bailee, the constitutional rights of the owner of those books and papers have been violated unless the Government proceeds under process of law before acquiring those papers, or unless the bailee has either actual or apparent authority to give them to the Government. See United States v. Hopps, 215 F.Supp. 734 (D.Md., 1962), and Lord v. Kelley, D.C., 223 F.Supp. 684 (1963), in which latter case the District Court in Massachusetts was faced with facts nearly identical with those in the present controversy.

The Fourth Circuit discussed a property owner's right to object to a search of bailed property in United States v. Eldridge, 302 F.2d 463 (1962). In that case the defendant, who owned an automobile, had loaned it to a friend, who authorized police to search the car. In the course of the search the officers discovered stolen property. The Court decided that the owner had given the bailee authority to authorize the search, and based its decision upon that point. How-

ever, implicit in the opinion is the premise that had such permission not been granted the owner would have been entitled to require legal process before the search would have been permissible, in spite of the fact that the bailee had authorized the search. The dissent appears to have concurred in that assumption, and the dissenting opinion is based upon the premise that the owner had not authorized the bailee to permit the search. Furthermore, the Supreme Court tacitly recognized such a right of the owner of books and records in Reisman v. Caplin, 84 S.Ct. 508 (1964), when it held that a taxpayer, whose property was in the hands of a bailee who was proposing to give that property to tax authorities, could restrain that action and by intervention assert his claim as owner of the property. While the Reisman opinion is concerned with statutory procedures, the Court is of the opinion that it also tacitly recognizes the property owner's constitutional rights.

The question then remains whether the bailee-accountant was authorized to allow the Internal Revenue agent to view, remove and copy the pre-1957 documents.

■ This Court finds that not only was the accountant not authorized to turn over these documents to the Government agents, but that he was specifically instructed that he should not turn them over. Thus, he had no authority in fact to give them to the Government.

The Court finds that the accountant, Graf, did not have any authority implied in law to allow the Government to take these papers. This is not a case where two people have equal rights in property or are co-tenants thereof. In such cases the courts have held that either party can consent to the search of the property, and any evidence resulting from that search can be used against either. See, for instance, Driskill v. United States, 281 F. 146 (9th Cir., 1922).

The Court has found no cases which hold that implied-in-law permission is given to a bailee to authorize search of the bailed property. Even the Fourth

Circuit, which in United States v. Eldridge, 302 F.2d 463 (1962), held that a bailee had permission to authorize search of an automobile, seems to have based that decision upon the premise that the authority was implied in fact from the nature of the bailed article and the bailee's dominion thereover, rather than upon any theories of authority implied in law which are inherent in the bailor-bailee relationship.

■ Nor did the accountant, Graf, have any apparent authority to allow the Internal Revenue agent to seize and inspect the books and documents in question. The Government agent's authorization to be on the premises did not authorize him to search and seize the books and records of the taxpayer. See United States v. Hopps, 215 F.Supp. 734 (D.Md., 1962); and United States v. Guerrina, 112 F.Supp. 126 (E.D.Pa., 1953).

In Lord v. Kelley, 223 F.Supp. 684 (D.Mass., 1963), the Court held that an accountant does not have apparent authority to deliver a taxpayer's books and records to the Internal Revenue Service. The Court concurs in that conclusion. While under some circumstances a bailee may have apparent authority to allow a search or seizure of the bailed articles (see United States v. Eldridge, supra), those circumstances were not present in this case. It was obvious, or should have been obvious, that the accountant was retaining these papers for the purpose of providing himself with a continuous record of the taxpayers' business transactions. His dominion over the documents was as an agent or employee of the taxpayers, for the benefit of the taxpayers, and was not for his own use or benefit as an individual. As such, he did not have that dominion over the articles in question which would have implied his authority to grant a search or seizure thereof.

There are several analogous situations. In United States v. Guerrina, 112 F.Supp. 126 (1953), the District Court in Pennsylvania held that a secretary did not have implied-in-fact permission to authorize Internal Revenue agents to search the files of her employer although she had exclusive control over the office in the employer's absence, during which time the agents made their visit. In United States v. Lagow, 66 F.Supp. 738 (S.D.N.Y., 1946), affirmed at 159 F.2d 245 (1946), Judge Holtzoff held that an employee who was not an officer of the corporation was not authorized to turn over corporate documents and records to agents of the Office of Price Administration. See also Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); and Stoner v. California, 84 S.Ct. 889 (1964).

If the Court were to hold that the accountant had either implied-in-law or apparent authority to deliver these papers to the Internal Revenue agent, such a holding would be an extension of the law of implied or apparent authority in contradiction to the holdings of the above-cited cases. The Supreme Court prohibited such an extension when it said, in Stoner v. California, 84 S.Ct. 889 (1964):

"Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'"

The Court then repeated its earlier statement in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), that:

" * * * it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical." (362 U.S. p. 266, 80 S.Ct. p. 733.)

And in United States v. Jeffers, 342 U.S. 48 (1951), the Court refused to permit what it termed a "quibbling distinction,"

involving property rights, to override constitutional rights.

It must be emphasized that the determination made herein is that when an owner of property, which has not been used in the commission of a crime and which is not contraband, has bailed that property, and has not given the bailee either actual or apparent authority to consent to a search or seizure of that property, the property cannot be searched or seized without legal process.

The distinction between property which is legally possessed and has not been used as an instrumentality in the commission of a crime, and property which has been used as an instrumentality in committing a criminal act, or which is illegally possessed, cannot be over-emphasized. This is a distinction which Mr. Justice Bradley deemed important in Boyd v. United States, supra, and which he traced back into the developmental stage of the English law. It is a distinction made by the court in United States v. Hopps, 215 F.Supp. 734 (D.Md., 1962), and which Mr. Justice Frankfurter insisted upon in his dissent in Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946). There the Justice said:

> "If, in the course of a valid search, materials are uncovered, the very possession or concealment of which is a crime, they may be seized. But to seize for evidentiary use papers the possession of which involves no infringement of law, is a horse of a different color." (328 U.S. p. 632, 66 S.Ct. p. 1281.)

It should be mentioned that in this case we are not dealing with books and records which are required by law to be kept. Such books and records, it has been held are not protected by the Fourth Amendment. Rodgers v. United States, 138 F.2d 992 (6th Cir., 1943); and Bowles v. Misle, 64 F.Supp. 835 (D. Neb., 1946). Nor is this a case where a taxpayer has waived his constitutional rights by entering into a contract or agreement with the Government. Zap

v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946).

The Court therefore concludes that taxpayers were subjected to an unconstitutional search and seizure of their property by the Internal Revenue agent, and that they have standing to object to that search and seizure.

■ The contention also has been made that the plaintiff seeks an injunction against Internal Revenue officers and that the Court does not have authority to issue such an injunction in a case of this nature. The Government contends that the Court's authority to supervise the United States Attorney does not extend so far as to give it power to control employees of various federal agencies. Whatever merit there may have been to that argument at one time, in view of Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956), it is no longer tenable. In Rea the Supreme Court held that a district court did have the power to forbid a federal narcotics agent from testifying in a state court. The Court said that the question raised was one:

> " * * * concerning our supervisory powers over federal law enforcement agencies. * * *
>
> "A federal agent has violated the federal Rules governing searches and seizures—Rules prescribed by this Court and made effective after submission to the Congress. * * * The power of the federal courts extends to policing those requirements and making certain that they are observed."

It further said:

> " * * * To enjoin the federal agent from testifying is merely to enforce the federal Rules against those owing obedience to them."

Mr. Justice Harlan's dissent was based upon his belief that at no time had the Court previously held that its supervisory powers extended over federal executive officers. Neither Wilson v. Schnettler, 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed. 2d 620 (1961), nor Cleary v. Bolger, 371

U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963), detracts from the holding ·of Rea. To the extent that Eastus v. Bradshaw, 94 F.2d 788 (5th Cir., 1938), is in contradiction to Rea, it is no longer the law.

The next question concerns the Court's jurisdiction to entertain the motion at this time.

 The Court is not convinced that this case does not involve a pre-indictment motion to suppress unconstitutionally seized evidence. One of the taxpayers involved is still alive and subject to criminal punishment. Rule 41(e), of the Federal Rules of Criminal Procedure, provides for pre-trial suppression of evidence in most instances where evidence has been seized in violation of the Fourth Amendment. And no longer can there be any doubt that such motions may be made before indictment. Lord v. Kelley, 223 F.Supp. 684 (D.Mass., 1963). Although the Supreme Court in DiBella v. United States, 369 U.S. 121, 82 S.Ct. 654, 7 L. Ed.2d 614 (1962), did not specifically hold that pre-indictment suppression motions were proper, it did hold that such motions were generally non-appealable. It is difficult to imagine that that Court would have ruled upon the appealability of such motions if it did not believe that the trial court had jurisdiction to entertain them originally.

Thus, in spite of language in some cases, such as Eastus v. Bradshaw, 94 F.2d 788 (5th Cir., 1938), which the Government here seeks to extend, it is clear that today federal courts will suppress evidence which has been obtained in violation of the Fourth and Fifth Amendments and that, at least where the rights violated are ones guaranteed by the Fourth Amendment, the suppression motion may be made prior to indictment.

The reason for the requirement of Rule 41(e) that such suppression motions must be made prior to trial, if the defendant has the knowledge on which to base the motion, is that good procedure requires that the questions of evidence be tried separately and apart from the trial of the criminal suit. The rule is designed to expedite orderly trial procedure and to avoid unnecessary delay. See the opinion of the United States Supreme Court in Jones v. United States, 362 U.S. 257, 264, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Likewise, the reason for allowing entertainment of the motion prior to indictment was succinctly stated by Judge Jerome Frank in In re Fried, 161 F.2d 453 (2nd Cir., 1947):

"The government further argues that an indictment founded upon such illicit evidence will do the applicant no harm, since such evidence will not be admitted at the trial which follows the indictment. That is an astonishingly callous argument which ignores the obvious. For a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted. The stigma cannot be easily erased. * * * Prosecutors have an immense discretion in instituting criminal proceedings which may lastingly besmirch reputations. That discretion is almost completely unfettered. It should surely not extend so far as to preclude judicial interference with a prosecutor's aim to induce an indictment by offering to a grand jury evidence which is the product of illegal acts of federal officers."

In the Fried case the Second Circuit held that Rule 41(e) was also applicable when the injury complained of was a coerced confession allegedly in violation of the Fifth Amendment. Justice Learned Hand concurred, and Justice Augustus Hand dissented. The determination that Rule 41(e) was also applicable to Fifth Amendment rights was questioned by the Sixth Circuit in Biggs v. United States, 246 F.2d 40 (1957), which relied upon Benes v. Canary, 224 F.2d 470 (6th Cir., 1955), where the Sixth Circuit held that Rule 41(e) was limited to cases involving violations of the Fourth Amendment.

The question of the scope of a Rule 41 (e) proceeding is important here, be-

cause the action complained of does not fall within any of the specific provisions of Rule 41(e) although it does come within the protection of the Fourth Amendment. The Court does not believe that its jurisdiction to entertain pre-indictment suppression proceedings, seeking the return of property and the suppression of evidence, is limited to those cases which are specifically enumerated in Rule 41(e); but believes, in accordance with Biggs v. United States, supra, and Benes v. Canary, supra, that that jurisdiction encompasses all instances in which the evidence was obtained in violation of the Fourth Amendment. Furthermore, the United States Supreme Court has held in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), that the exact words of Rule 41 (e) are not controlling, but, rather, that the important consideration is the general policy behind the rule.

However, even if no criminal prosecution is contemplated, the Court has jurisdiction to entertain this motion. If, as the Court has found, its jurisdiction to entertain pre-trial motions seeking the suppression and return of property seized in violation of the Fourth Amendment is as broad as that amendment, it necessarily follows, in view of Boyd v. United States, supra, that it has jurisdiction to order the suppression and return of property before the institution of the civil tax proceeding.

This is not an action to enjoin assessment and collection of a tax. (See Vuin v. Burton, 327 F.2d 967 (6th Cir., 1964); and De Masters v. Arend, 313 F.2d 79 (9th Cir., 1963).) It is an action seeking the suppression and return of property. The issue of the collection of the revenues is involved only to the extent that the Government has sought to proceed with that collection by unconstitutional means. No order here will prohibit a tax assessment or collection; it will only prohibit the very imminent prospect of the use of unconstitutionally seized property in making that assessment.

This Court therefore concludes that it has jurisdiction to entertain this motion to suppress and return the evidence obtained in violation of the Fourth Amendment, although the actions complained of do not literally come within the terminology of Rule 41(e).

The question then arises as to the appropriate remedy. In its original opinion the Court required the permanent suppression of all of the evidence which the Government had obtained from its examination and copying of the taxpayers' property for the years prior to 1957, and further required the return of that property to the taxpayers. In view of the present determination that the search and seizure was in violation of the Fourth Amendment of the United States Constitution, that determination was correct.

The exclusionary rule of evidence which seeks to protect citizens from unconstitutional searches and seizures was first enunciated in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914):

"The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions, the latter often obtained after subjecting accused persons to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." (232 U.S. P. 392, 34 S.Ct. p. 344.)

"If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment,

praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." (232 U.S. P. 393, 34 S.Ct. p. 344.)

" * * * this court said that the Fourth Amendment was intended to secure the citizen in person and property against unlawful invasion of the sanctity of his home by officers of the law acting under legislative or judicial sanction. This protection is equally extended to the action of the government and officers of the law acting under it. * * * To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." (232 U.S. P. 394, 34 S.Ct. p. 345.)

In Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the court held that the Fourth Amendment was applicable to the states. In Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the court held that the exclusionary rule of Weeks v. United States likewise was applicable to the states. Throughout these opinions the Supreme Court has made it clear beyond doubt that the Fourth Amendment is basically a right to privacy, and in Mapp v. Ohio, supra, it held that where that right to privacy exists the suppression of unconstitutionally seized evidence was "an essential part of the right to privacy." A Michigan district court, in United States v. Young, 215 F.Supp. 202 (E.D.Mich., 1963), in ordering return of certain receipt books which had been obtained from the taxpayer by a Government agent, said:

"The Government should not be allowed to make illegal searches and then use the information it thereby discovers as a wedge for prying incriminating evidence out of the citizenry. Such a result would succeed in making a sham of the Fourth Amendment and not be in keeping with the mandate of the Supreme Court and the Court of Appeals for the Sixth Circuit that the Fourth Amendment should be liberally construed. See Catalanotte v. United States (C.A.6, 1953), 208 F.2d 264, * * *."

And a district court in Pennsylvania, in United States v. Guerrina, 112 F.Supp. 126 (E.D.Pa., 1953), in ordering suppression of certain evidence obtained from the defendant's books and records which the Internal Revenue Service was seeking to use against him, said:

"Where Federal officers violate the Constitution in obtaining evidence 'the federal courts refuse to hear it, esteeming the upholding of the constitutional guaranties against abuse of governmental power more important in such circumstances than the discovery of the truth.' * * * And ' * * * the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment.' "

The original determination of this Court required the suppression, for purposes of both criminal and civil tax proceedings, of the evidence unconstitutionally obtained and of the other evidence simultaneously obtained during the execution of the plan to effectuate an unconstitutional search and seizure. The Government has strongly contended that it is improper to order the suppression of the evidence for civil purposes, and has claimed that the suppression theory is applied only in criminal cases.

It is certainly true that the suppression theory is usually applied in criminal cases, but this is because most cases which involve an unconstitutional search and seizure are criminal prosecutions. The Government has been able to present

the Court with no rationale which would support a determination that suppression is proper where the unconstitutional search and seizure would lead to criminal jeopardy, while at the same time holding that suppression would not be proper when the unconstitutional search and seizure would lead to a civil tax liability. Rather, there are most satisfactory reasons for refusing to make such a distinction.

In Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the Supreme Court stated the basis for the exclusionary doctrine. It is clear that the basis does not depend upon the trustworthiness of the evidence obtained; rather, it depends upon the sanctity of the right to privacy and the proposition that to preserve that sanctity the Government must not be allowed to benefit by its own wrongs. The Court referred to "the imperative of judicial integrity," (367 U.S. P. 659, 81 S.Ct. p. 1694), and went on to say:

> "The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the character of its own existence."

The Court then quoted with approval Mr. Justice Brandeis's dissent in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

> "Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. * * * If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."

Neither judicial integrity nor governmental example would be enhanced by allowing the use of unconstitutionally seized evidence in a civil tax proceeding. The factors which militate against the use of such evidence are as strong in such a proceeding as they are in any criminal case while, in fact, the factors mitigating against the suppression of such evidence are far less satisfactory. Here there is no instance of turning hardened and dangerous criminals loose upon society; here there is no instance of allowing heinous and immoral crimes to go unpunished; here there is but the potentiality of some slight decrease in the governmental revenues. If any distinction were to be drawn between civil tax proceedings and criminal proceedings in regard to the exclusionary rule of evidence, it would be far more appropriate, from the viewpoint of protecting society, that evidence be excluded in civil tax cases than that it be excluded in criminal cases. But the Court is convinced that as our law has developed no distinction is tenable. In view of Mapp v. Ohio, supra, it is apparent that all unconstitutionally seized evidence must be suppressed. Speaking of the right to privacy under the Fourth Amendment the court there said that suppression was "an essential ingredient of the right. * * *" If suppression is a part of the right, it is as much a part in a civil proceeding as it is in a criminal one.

Furthermore, the denial to the Government of opportunities to collect taxes is not an unknown sanction when the Government has overstepped the bounds of its authority. In Reineman v. United States, 301 F.2d 267 (7th Cir., 1962), the trial Court had enjoined the collection of a deficiency assessment, not upon the basis that the taxpayers' constitutional rights against search and seizure had been violated, but because the Government had ignored taxpayers' rights to a reopening letter before it re-examined their books. Because the taxpayers were left without a remedy to correct the Commissioner's illegal action unless the deficiency assessment, which was based upon the illegally discovered facts, was set aside, the Appellate Court affirmed the injunction.

The remaining question concerns the scope of the suppression order. In Lord v. Kelley, 223 F.Supp. 684 (D.Mass., 1963), the Court was faced with a problem substantially the same as the one

herein. The Court there ordered the return of the records to the taxpayers, but permitted the Government to reacquire them later by appropriate process. It held that such a remedy was appropriate because the object of suppression was to place the taxpayers in as good a position as they would have been in had the unconstitutional search and seizure not occurred, but that it would be inappropriate to place them in a better position. The short answer to this proposition is that the desired result is impossible to attain. Because of the Government's unconstitutional actions, the taxpayers have been put to great expense in an attempt to protect their rights. Meanwhile, the very insistence on those rights may cause the Government to seek to see the documents involved, upon the theory that no person objects to the production of innocent evidence. By the very nature of such a situation the Government would be seeking to benefit by its own wrongs. Such benefit is the very thing which the exclusionary rule seeks to prevent. Mapp v. Ohio, supra. Furthermore, to allow those books and records to be reacquired would be to give but a hollow victory to the vindication of constitutional rights.

However, there were equitable considerations in the Massachusetts case which inclined that Court toward the more lenient remedy awarded there. Those considerations do not exist in this case. The opinion in Lord v. Kelley, supra, states that the Internal Revenue agent acknowledged his error in open court, and it was the opinion of the Court that it was unlikely that Internal Revenue agents would soon again, if ever, participate in such unconstitutional action.

In this case the Government has shown no contrition over its errors, but throughout this proceeding has discounted them as mere technical deviations from hampering statutory requirements. However, the Court has determined that the actions taken were not only violations of the statutes, which indeed they were, but that they were unconstitutional deprivations of the rights guaranteed to every citizen by the Fourth Amendment. The language of the dissent in Zap v. United States, 328 U.S. 624, 633, 66 S.Ct. 1277, 1281, 90 L.Ed. 1477 (1946), is particularly appropriate:

> "The Government deems this a 'technical error.' It is a 'technicality' of such substance that this Court has frequently announced the duty to suppress evidence * * *. The fact that this evidence might have been secured by a lawful warrant seems a strange basis for approving seizure without a warrant. The Fourth Amendment stands in the way."

Upon reconsideration, the original determination will not be modified.