**STATE OF IOWA, Iowa State Highway Commission, and every other Political Subdivision of the State of Iowa, Plaintiffs,**

v.

**UNION ASPHALT & ROADOILS, INC., et al., Defendants.**

Civ. No. 7–1932–C–2.

United States District Court
S. D. Iowa,
Central Division.

March 14, 1968.

Richard C. Turner, Atty. Gen., Roger H. Ivie, David B. Hendrickson, Asst. Attys. Gen., Des Moines, Iowa, for plaintiffs.

Herschel G. Langdon, Des Moines, Iowa, Verne H. Maxwell, Dallas, Tex., Colvin A. Peterson, Jr., Kansas City, Mo., Roy W. Meadows, Des Moines, Iowa, C. T. McClure, Oklahoma City, Okl., Max Putnam, Harris M. Coggeshall, Des Moines, Iowa, J. O. Watson, Jr., Indianola, Iowa, Elmer B. Hodges, Kansas City, Mo., Robert G. Bridges, Des Moines, Iowa, James R. Eagleton, Tulsa, Okl., Bennett A. Webster, Des Moines, Iowa, Charles W. McDermott, Colorado Springs, Colo., Joseph W. Kennedy, Wichita, Kan., Howard A. Steele, John C. Cortesio, Jr., Des Moines, Iowa, F. R. Olmsted, Kansas City, Mo., J. Rudolph Hansen, John A. McClintock, Des Moines, Iowa, Lynn Adams, Oklahoma City, Okl., John R. Mackaman, Des Moines, Iowa, Charles F. Rice, New York City, Edward F. Howrey, Washington, D. C., J. Riley McManus, Des Moines, Iowa, Neil E. McManus, Keokuk, Iowa, Paul F. Ahlers, Des Moines, Iowa, S. E. Floren, Lewis J. Ottaviani, Bratlesville, Okl., Leroy Jeffers, Houston, Tex., Theodore T. Duffield, James A. Lorentzen, Donald A. Wine, Des Moines, Iowa, J. R. Shanahan, Chicago, Ill., Donald K. McIntosh, New York City, David E. Byers, Des Moines, Iowa, John F. Smith, Kansas City, Mo., D. J. Goode, Des Moines, Iowa, Ernest Godshalk, James K. Eagan, H. Laurance Fuller, Walter T. Kuhlmey, Chicago, Ill., Eugene Davis, Des Moines, Iowa, James O. Sullivan, William C. Weitzel, Jr., New York City, Robert W. Brennan, Des Moines, Iowa, George T. O'Laughlin, Kansas City, Mo., Frank W. Davis, Des Moines, Iowa, Robert J. Woolsey, Lawrence A. Johnson, Tulsa, Okl., for defendants.

## MEMORANDUM AND ORDER.

HANSON, District Judge.

This ruling is predicated upon an application by attorneys Verne Lawyer and Lex Hawkins for attorney fees and upon their motion to amend an Order of the Court filed on January 10, 1967, permitting their withdrawal. It is only fair to note that there is complete agreement by all that counsel are entitled to fees in some amount. The only question is under what process this can ultimately be consummated.

On January 10, 1967, Lex Hawkins and Verne Lawyer made an application to withdraw as attorneys for the State of Iowa in the above entitled litigation.

The Application related that on September 30, 1966, they had been employed to prosecute the action by the then Attorney General of the State of Iowa, Lawrence F. Scalise. On January 5, 1967, the present Attorney General of the State of Iowa, Richard Turner, requested Verne Lawyer to resign and to take no further legal action in the case and on January 6, 1967, made the same request and direction to Lex Hawkins. He further instructed Lex Hawkins to relinquish the files of the cause on January 9, 1967. The applicants complied with the latter demand on January 9 by delivering them to the Attorney General's Office. Due primarily to these events, the applicants made a motion for the Court to permit them to withdraw their appearance and to be relieved of any further responsibility in the case. On January 10, 1967, the Court issued an Order which granted the Application "for good cause shown."

The next day, the Attorney General and Roger H. Ivie, Assistant Attorney General, made a motion for the Court to authorize them to appear in behalf of the State and for "an order withdrawing the names of Lawrence F. Scalise and Nolden Gentry as attorneys of record." The State did not include the Applicants' names in its motion and apparently did not notify them of the motion. The Court granted that motion on the same day.

On August 16, 1967, Mr. Lawyer and Mr. Hawkins presented an application for attorney fees. By an Act of the Sixty-Second General Assembly, their employment was "legalized, validated and confirmed." In addition, Exhibit 1 reads as follows:

> "Sec. 2. Awards to such attorneys for services rendered and expenses incurred as a result of such legal representation shall be set and determined by a judge of a court having jurisdiction over the subject matter thereof, after holding a hearing thereon.
>
> Sec. 3. Any such award of judgment rendered by such court shall be a judgment in favor of Lex Hawkins and Verne Lawyer against the state of Iowa and shall be paid in the same manner as a judgment or award against the state of Iowa is paid pursuant to section twenty-five A point eleven (25A.11) of the Code."

The Application alleges that this Court is authorized "pursuant to the authority granted by said Act" to set the amount of attorneys' fees and expenses and render judgment for such amounts. A hearing was held on the Application on September 7, 1967.

A motion was filed by applicants on November 6, 1967, and the motion is grounded on Federal Rule of Civil Procedure 60(b). The applicants urge that the Court should amend its Order of January 10, 1967, upon the grounds of mistake, inadvertence and surprise and permit their withdrawal as counsel only upon condition that they be paid reasonable attorney fees.

 The Application can be construed as alleging that the Iowa legislature has bestowed jurisdiction upon this Court. Federal Courts are courts of limited jurisdiction. They have only that jurisdiction which Congress, acting within the limits of the Constitution, confers upon them. See Giancana v. Johnson, 335 F.2d 366 (7 Cir.), cert. den. 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1964); Badger v. Reich Bros. Const. Co., 161 F.2d 289 (5th Cir.); aff'd 333 U.S. 163, 68 S.Ct. 587, 92 L.Ed. 614 (1947), rehear. den. 333 U.S. 878, 68 S. Ct. 00, 92 L.Ed. 1153; Fisch v. General Motors Corp., 169 F.2d 266 (6th Cir.) cert. den. 335 U.S. 902, 69 S.Ct. 405, 93 L.Ed. 436 (1949). A state legislature cannot expand the jurisdiction of the federal courts. Chicago R. I. & P. Ry. Co. v. Stude, 346 U.S. 574, 74 S.Ct. 290, 98 L.Ed. 317, rehear. den. 347 U.S. 924, 74 S.Ct. 512, 98 L.Ed. 1078; Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); Davis v. Ensign-Bickford Co., 139 F.2d 624 (8th Cir.). A state legislature cannot confer jurisdiction which is not authorized by Congress upon a federal court. In re Bor-

ough of Fort Lee, 230 F.2d 200 (3rd Cir.); Chicago R. I. & P. Ry. Co. v. Ten (10) Parcels of Real Estate Located in Madison County, Iowa, 159 F.Supp. 140 (D.Iowa); Range Oil Supply Co. v. Chicago R. I. & P. Ry. Co., 140 F.Supp. 283 (D.Minn.). Moreover, the legislature could not control or supervise this Court by directing a hearing to be held upon this matter. Stephenson v. Grand Trunk Western Ry. Co., 110 F.2d 401, 132 A.L.R. 455 (7th Cir.), cert. granted 310 U.S. 623, 60 S.Ct. 1101, 84 L.Ed. 1395, cert. dism'd. 311 U.S. 720, 60 S.Ct. 1107, 85 L.Ed. 469. However, the Court must determine whether it has jurisdiction under the federal Constitution, federal laws, or principles of federal jurisdiction.

The Court will first give its attention to whether the Application for attorney fees should be granted, apart from the question of whether the motion to amend the Court's Order of January 10, 1967, will be granted. The resolution of two issues will be dispositive of the first question: (1) whether the determination of attorney fees is within the boundaries of the traditional realm of federal jurisdiction; and, (2) whether consideration of the Application is now precluded because of the Order of January 10. The Court will then discuss the question of whether that Order must be amended to condition withdrawal upon the remittance of reasonable attorney fees. If the Court decides to amend its Order, the application for attorney fees will automatically be granted.

The applicants urge that jurisdiction of the matter of attorney fees may be sustained by the doctrine of federal ancillary jurisdiction. The ancillary jurisdiction theory is relatively simple— once federal jurisdiction properly attaches to a primary case, the court also has jurisdiction over certain subsidiary or subordinate disputes even though it might not independently be able to proceed to adjudicate them. See, e. g., Murphy v. Kodz, 351 F.2d 163 (9 Cir.); Lee v. Terminal Transport Co., 282 F.2d

805 (7 Cir.), cert. den. 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 705 (1960); Aetna Ins. Co. v. Chicago, R. I. & P. R. Co., 229 F.2d 584 (10 Cir.); Glen Falls Indem. Co. v. United States, etc., 229 F.2d 370 (9 Cir.). It is well-settled that upon substitution of attorneys in litigation, a client may be required to either pay the attorney or to post security for reasonable fees as ancillary to the Court's jurisdiction of the main case. See e. g., National Equipment Rental, Ltd. v. Mercury Typesetting Co., 323 F.2d 784 (2 Cir.); Maddox v. Jinkens, 66 App.D.C. 362, 88 F.2d 744; Woodbury v. Andrew Jergens Co., 69 F.2d 49 (2 Cir.). In the situation at hand, the Court's jurisdiction to fix attorney fees is generated by its auxiliary relation to the antitrust action by the State. It may be true that the practice of injecting a condition of departure into an Order of removal is proper, but the Court cannot agree that it must be done in every case. The precepts of the ancillary jurisdiction doctrine dictate that the federal courts should extend their jurisdiction to encompass orbital disputes subordinate to the principal action so that *complete* justice may be done. See Walmac Co. v. Isaacs, 220 F.2d 108 (1 Cir.); Cooperative Transit Co. v. West Penn Elec. Co., 132 F.2d 720 (4 Cir.); Ancillary Jurisdiction of the Federal Courts, 48 Iowa L.Rev. 383 (1963). Considerations of judicial economy and fairness to all parties underlie the ancillary jurisdiction theory. Consolo v. Federal Maritime Comm., 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). And once jurisdiction has attached, it will generally continue until it has been fully exhausted. Rhodes v. Houston, D.C., 202 F.Supp. 624, Aff'd. 309 F.2d 959 (8 Cir.), cert. den. 383 U.S. 971, 86 S.Ct. 1282, 16 L.Ed. 2d 311 (1965). It would appear that the sound policies behind the doctrine and its elasticity would command the Court to retain jurisdiction over the auxiliary matter of attorney fees even though it entered a previous Order allowing the counsel to withdraw without such a condition. Cf. United Mine Workers of

America v. Gibbs, 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1965).

 Taking the position that before there can be a fee determination there must be an application for removal by a party adverse to counsel seeking fees in which there is no allegation of misconduct or there is an allegation of misconduct that is not substantiated, or taking the position that where applicants voluntarily applied for and were granted withdrawal, the Court has no jurisdiction, is untenable and without merit. A proper application does not have to be made where the authority of the new attorney is recognized and he has been permitted to appear without objection. See, e. g., In re Goldstein, 43 F.2d 698 (2 Cir.), cert. den. Goldstein v. Klages, 282 U.S. 879, 51 S.Ct. 83, 75 L.Ed. 776; In re Morgan's Estate, 94 Cal.App. 617, 271 P. 762; Doerle v. Doerle, 96 Misc. 72, 159 N.Y.S. 637. An attorney himself may make such a motion where he has been notified of his discharge by the client but he has not promptly made the motion. See United States v. McMurtry, 24 F.2d 145 (D.N.Y.). The motion does not have to be in any rigid form. This would seem to be particularly true here as Local Rule E of the Local Rules of the United States District Court for the Southern District of Iowa requires that an attorney obtain leave of court before withdrawing.

In the case at hand, the applicants stated that the Attorney General made a motion for continuance on January 6, 1967, which was prior to the withdrawal of applicants. The Court signed an Order of continuance of discovery upon his oral application. The applicants further stated that Verne Lawyer was requested to resign by the Attorney General on January 5, 1967, and Lex Hawkins was asked to resign on January 6. They resigned on January 9 when they conveyed the files of the case to his office. There has been no allegation contrary to these statements by the State. The Court does not feel the State promptly presented a motion for substitution on their dis-

charge. Further, an application on behalf of the State was not necessary to protect the State against misconduct by the applicants. There has never been any question that attorney fees were due and owing them. The Act of the Sixty-Second General Assembly destroyed any possible contention in that regard by legalizing the employment of the applicants and providing that awards for their services and expenses "shall be set." Thus, there is no necessity of determining the validity of any non-existent allegation of misconduct.

 However, assuming that the process is irregular, the State has acquiesced in the retention of jurisdiction by this Court over the determination of fees. It is manifest that both the State and the applicants anticipated no difficulties in relation to the presentation of an application to this Court for the determination of reasonable attorney fees and securing an adjudication thereof. There was no attack upon the propriety of a fee determination by the Court at the time it granted the withdrawal of the applicants even though the State was obviously conscious of that process. The State made no allegation of misconduct then or the next day when it presented its own motion for substitution. The legislature apparently had no reservations about the applicants being entitled to fees for the services they had rendered for the State and that this Court would be the appropriate judicial body to set them because they were to be fixed "by a judge having jurisdiction over the subject matter thereof." In fact, the State and the applicants were operating under the supposition that the procedure taken was without defect until the hearing upon the application on September 7, 1967. The Court was the first to raise the possibility of a legal deficiency in the process when it questioned the jurisdictional basis of the determination at the hearing. But, most importantly, even at that stage, and with knowledge of the Court's remarks in that regard, the State elected to move forward

with the offer of evidence as to the amount of fees and to defer examination of the Court's jurisdictional power with the objective of sustaining its jurisdiction. By that act, the State acquiesced in the procedure instituted for fee determination and the adjudication itself.

But in any event, the Court is compelled to grant the motion of applicants under Federal Rule of Civil Procedure (60(b) and the Court will amend its Order of January 10, 1967, to condition the withdrawal of applicants upon the payment of reasonable attorney fees. Under that Rule, a court has the power to relieve a party from "a final judgment, order or proceeding" due to "(1) mistake, inadvertence, surprise, or excusable neglect; * * * or (6) any other reason justifying relief from the operation of the judgment." The rule is to be liberally construed to accord justice. See, e. g., In re Casco Chemical Co., 335 F.2d 645 (5 Cir.); United States v. Gould, 301 F.2d 353 (5 Cir.); Radack v. Norwegian American Line Agency, Inc., 318 F.2d 538 (2 Cir.); Patapoff v. Vollstedt's, Inc., 267 F.2d 863 (9 Cir.); 3 Barron and Holtzoff, Federal Practice and Procedure, Section 1322 (1958 ed.). Such a motion may be made within a reasonable time.

It has authoritatively been prescribed that the Court may condition its order of substitution upon a grant of attorney fees. First Iowa Hydro Elec. Co-op. v. Iowa-Illinois Gas & E. Co., 245 F.2d 613 (8 Cir.). See also National Equipment Rental, Ltd. v. Mercury Typesetting Co., supra; Doggett v. Deauville Corp., 148 F.2d 881 (5 Cir.); Woodbury v. Andrew Jergens Co., supra; The Flush, 277 F. 25 (2 Cir.); Kotsifakis v. A. Lusi, Ltd., 138 F.Supp. 945 (D.Va.). In John Griffiths & Son Co. v. United States, 72 F.2d 466, 468 (7 Cir.), the court declared:

"* * * where an attorney is employed upon a contingent fee and the clients desire to terminate the relations, the proper practice is to set a motion for substitution down for a hearing, notify the attorney of record of the motion, ascertain all that is due and owing him by reason of his services and expenses, and provide for payment of his compensation as a condition precedent to the allowance of the order of substitution."

It will be recalled that both parties and the legislature maintained the belief that the procedure undertaken to attain fee determination by this Court was proper and the Court has taken evidence upon the amounts to be granted. Similarly, the Court has previously dealt with the proposition that the procedure is not amenable to a fee determination here. The equities of the integrated factual picture strongly militate in favor of granting applicants' motion. Further, out of judicial courtesy to the legislative branch of government of the State of Iowa, the Court should not lightly abdicate its responsibility in this regard even though its authority is not necessary to pursue this matter.

It appears that a very analogous situation confronted the Court in the John Griffiths & Son Co. case, supra. In that case, an order of substitution was granted apparently without a condition of payment of attorney fees. The former counsel made a motion to set aside the order and to ascertain the amount due him before passing upon substitution. The Court permitted the order to remain intact but retained jurisdiction of the matter of attorney fees. The Court of Appeals held that: "In this procedure there was no reversible error."

Moreover, in addition to Rule 60, the Court deems it desirable to utilize its inherent power to correct what it feels to be a faulty order. See Wallace v. United States, D.C., 50 F.Supp. 178, reversed on other grounds, 142 F.2d 240 (7 Cir.), cert. den. 323 U.S. 712, 65 S.Ct. 37, 89 L.Ed. 573 (1944); Bucy v. Nevada Const. Co., 125 F.2d 213 (9 Cir.); Myers v. Westland Oil Co., 96 F.Supp. 667 (D.N.D.).

Thus, as a matter of law the Court has power to adjudicate the matter of attor-

ney fees for applicants under federal ancillary jurisdiction, by amendment of its Order under Rule 60(b), and under its inherent power to correct orders.

It will be ordered that the application for reasonable attorney fees by Lex Hawkins and Verne Lawyer will be granted in the amounts to be fixed by the Court.

It remains for the Court to adjudge the amounts of attorney fees which shall be paid to the applicants. After a thorough consideration of all evidence adduced at the hearing held upon the subject, and in accordance with established quantum meruit principles, the Court must conclude that each should receive the sum of $50.00 an hour for the time consumed in relation to the case. The Court will not engage in a long, prolix discourse upon the basis for this calculation but will outline some of the more salient reasons behind it.

The material criteria guiding compensation of attorneys on a quantum meruit measure are generally: the nature, extent, and difficulty of the services; and time devoted to the litigation; the loss of opportunity for other employment; the skill and standing of the lawyer; the value of interests involved and the responsibility assumed; the results secured; and, the customary charges for similar services. See Annot. 56 A.L.R. 2d 13; ABA Cannons of Professional Ethics 12(4); 7 Am.Jur.2d Attorneys at Law, Sections 232, et seq.

The case at bar is one of a species of highly complex litigation. The preparation of an antitrust suit involves a myriad of details and the organizational problems are great. See, e. g., Cape Cod Food Products, Inc. v. National Cranberry Ass'n., 119 F.Supp. 242 (D. Mass). The intricate economic problems presented in a case of this sort demand seasoned trial lawyers with some expertise in the area. The applicants were a primary stimulus in the prosecution of the case against the defendants who are represented by a formidable army of capable attorneys. Should the State prevail, the monetary fruits to the public could be great. Also, if the allegations made by the State are found to have substance, an intangible vindication of a public wrong would be accomplished.

The resumes of Lex Hawkins and Verne Lawyer, and the Court's experience with their legal work, convince the Court that they are men belonging to the highest echelon of the legal ranks. No challenge has been made to the integrity and ethical orientation of these lawyers. They are experienced trial lawyers who were both employed by the State of Alaska last year as Special Attorney Generals for the prosecution of antitrust actions.

The time expended in preparation of the State's case has not been minimal. Mr. Lawyer spent 167¾ hours in furtherance of the cause and Mr. Hawkins worked 238½ hours on the case. Mr. Lawyer had an additional 31 hours of time through an employed lawyer, Mr. M. R. Dunn. It is unquestionably true that the applicants were forced to pass up other lucrative employment due to their involvement in this demanding piece of litigation. The applicants submitted detailed time reconstruction sheets as to the utilization of their time. The Court has no question that the time was exhausted as set out in the summaries. The State has not in any manner made any serious or realistic attack upon the validity of the reconstruction in the documents.

Mr. Hawkins and Mr. Lawyer generally receive remuneration in excess of $50.00 an hour for their legal activities, but it appears that the State paid a maximum of $50.00 an hour for outside assistance in protracted litigation about the period in which they were employed. The present Attorney General was aware of at least one attorney who received $50.00 an hour during the previous Attorney General's tenure in office. Neither the Attorney General nor Mr. Ivie had any opinion as to the value of appli-

cants' services when questioned in that regard.

The Court is of the opinion that the quantum meruit factor of benefits secured is not an appropriate consideration in this case as the applicants' employment was terminated prior to the ultimate disposition of the suit. The Court is fully cognizant that only a percentage of the research and investigation conducted by attorneys blossom into valuable weapons for use in the arena of legal battle and that the extent of this work can never be ascertained with certainty, even at the conclusion of a case. But even though the outcome of the litigation is not subject to prognosis, and the Court can make no intimation in that regard, it is clear that the State has received substantial benefits from their efforts at this stage of the proceedings. The State's case has been bolstered by virtue of materials contained in the attorneys' files delivered to the State, the Complaint drawn by applicants, correspondence by the applicants to the Attorney General's Office, the conversations between the applicants and Mr. Ivie on the case, and a meeting held before the Executive Council of the State of Iowa on September 7, 1967, in which certain facts were disclosed to the State by the applicants. Finally, the Executive Council concurs with the Court in that they felt that the applicants had fully and completely discharged their responsibilities in providing all the useful information that they could upon the case.

Therefore, it will be ordered that Verne Lawyer receive compensation of $8,387.50 for his services. He will receive the further sum of $775.00 for the 31 hours of Mr. Dunn at a rate of $25.00 an hour. He will also be reimbursed for $1,053.99 out-of-pocket expenses.

It will further be ordered that Lex Hawkins be paid $11,925.00 for his services and will receive remuneration of $1,989.15 for expenses.

## ON MOTIONS TO DISMISS

This ruling is predicated upon the defendants' motions to dismiss the class action or to strike paragraphs 7, 8, and 9 of the Complaint or, in the alternative, for an Order limiting the class of plaintiffs.

This is an action to recover treble damages for injuries allegedly resulting from violations by the defendants of the Sherman and Clayton Acts. The defendants are business entities which have engaged in the business of distributing and selling liquid asphalt and allied materials in the State of Iowa. The plaintiffs are parties which have purchased these products from the defendants. The Complaint alleges that the defendants owned or controlled substantially all of the sources of liquid asphalt products reasonably available to supply the needs of the State of Iowa, the Iowa State Highway Commission, and the political subdivisions of the State. It further alleges that the defendants combined and conspired to restrain interstate commerce by fixing prices charged for asphalt products.

Fifteen of the defendants have objected to the maintenance of this suit as a class action. They contend that the requirements of Rule 23 have not been met and that the Attorney General of the State of Iowa does not have authority to represent the political subdivisions of the State of Iowa.

The defendants present several reasons why it is thought that a class action is not appropriate. Stated briefly, the defendants contend that the four pre-requisites to a class action set out in Rule 23(a) have not been met and that the two pre-requisites of Rule 23(b) (3) are also not fulfilled. These will now be considered in order.

Rule 23(a) permits a class action only if:

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and ade-

quately protect the interests of the class."

There is no contention that the first of these requirements is not met. Without considering at this point which political subdivisions would be included in the class, it is clear that taking only the counties, cities, and towns, the potential number of members is so large as to make joinder of all impractical. It may be that notice to all potential members of the class would bring about sufficient exclusions to allow joinder, but there may be no speculation as to that possibility.

Nor is there any difficulty with the second requirement of Rule 23(a). Undoubtedly there would be questions of law and fact common to the class. Whether they predominate over individual interests will be taken up shortly.

 The third requirement is the subject of dispute between the parties. It is argued that the claims of the representative parties are not typical of the claims of the members of the class, that the relief sought is not typical, and that the defenses to the claims of the representatives are not typical. Numerous disparate facts are set out in the defendants' brief which are said to indicate the unavailability of a class action. Many have to do with the manner in which the members of the alleged class have purchased asphalt products from the defendants. Some members purchased directly from the defendants while others negotiate with contractors who agree to supply asphalt products. Variations in the kind of asphalt product purchased, differences in prices due to transportation charges and quantity of purchase, normal variations in price due to market conditions, and other factors are described in detail in the briefs and affidavits.

The difficulties presented by a disparity of facts such as these were satisfactorily resolved recently in a similar price-fixing suit. See Philadelphia Electric Company, et al. v. Anaconda American Brass Company, 43 F.R.D. 452 (E.D.Pa.1968). There it was concluded

that the overriding considerations typifying each claim were the need to prove:

"(1) that there was a conspiracy to fix prices in violation of the antitrust laws; (2) that prices were fixed pursuant thereto; and (3) that plaintiffs purchased products at prices which, as a result of the conspiracy, were higher than they should have been."

The import of varied circumstances surrounding purchase transactions giving rise to a claim was persuasively stated in these terms:

"The defendants point out that the products mentioned in the complaint include 'at least twelve separate groups of products which are separately priced and have distinct end uses;' that plaintiffs may have purchased like products from other manufacturers, at prices not shown to have been affected by the alleged conspiracy; that during the period covered by the alleged conspiracy there were dozens of price changes in each product-line; and that there were wide variations in methods of purchase and in prices actually paid. But these circumstances, it seems to me, demonstrate merely (1) the possible desirability of establishing sub-classes as the facts develop; (2) the likelihood that plaintiffs may be unable to prove all they claim; and (3) the fact that many of the issues relating to damages are individual rather than common to the class. Cf. Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966); Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y. 1966)."

This Court adopts the reasoning of the above quoted opinion in finding that the third requirement of Rule 23(a) is met.

 The defendants raise two questions in regard to the fourth requirement of Rule 23(a). First, it is urged that the Attorney General does not have the authority under Iowa law to represent the alleged members of the

class. This Court regards this contention as being without merit. In representing the class in a suit such as this, the representative parties act principally in furtherance of their own claim. An underlying assumption of a class suit is that substantial similarity of claims allows all members to benefit from the efforts of the representative parties. If the prerequisites to a class action are present in this suit, the Court will not consider the question of formal authorization under Iowa law. The right to be represented here is established by the Federal Rules of Civil Procedure. Limitations on the authority of the Attorney General would more properly be raised when and if he departs from the areas of unquestioned authority to pursue the individual claims of members of the class. This preliminary determination of the existence of a class action does not attempt to dispose of all questions that may arise. The common need to prove conspiracy and price-fixing sufficiently indicates that the Attorney General is a proper representative under Rule 23.

The defendants have also argued the dissimilar factors in each claim require the representative parties to act in their own interests. The preceding discussion of overriding considerations of commonality meets this objection. Furthermore, members of the class would be required to assume the responsibility of proving some matters such as the amount of damages. Also in answer to the question of adequate and proper representation, it is important not to overlook the power of the Court under Rule 23(d) to make appropriate orders,

"* * * (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters."

In addition to the requirements of Rule 23(a), the requirements of 23(b) (3) which must be met if this suit is to be maintained as a class action are that

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

What has been said earlier concerning the typicalness of the representative claims is also the Court's basis for concluding that common questions of law and fact predominate over questions affecting individual members. There certainly will be individual questions in regard to damages but these are not the dominant problems in this suit.

The Court is convinced that a class action is superior to other methods of settling the controversy. The factors set out in the Rule as pertinent considerations clearly support this conclusion. There is no other litigation concerning this controversy already commenced by members of the class and no interest of

members in individually controlling the prosecution. This particular forum is the natural and desirable place for combining the claims since all members of the class are legal entities of this State. Although it is impossible to estimate with any degree of certainty the number of parties who wish to be represented in this suit, it does not appear that difficulties of management will be so great as to prevent its maintenance. Difficulties in devising adequate notice procedure are relevant to the question of manageability but here they are not controlling.

It has been assumed throughout the foregoing that the class would be as inclusive as the representatives have proposed. By means of that assumption the Court has been able to make the preliminary determination without regard to the possibility that the class would later be expanded. It is now incumbent upon the Court to specify the members of the class. In this there is no need to look further than the list of prospective members submitted by the representative parties. These legal entities are:

1. All ninety-nine (99) counties
2. Nine hundred forty-seven (947) cities and towns
3. Four hundred seventy-four (474) school districts
4. County boards of education
5. Park boards
6. Drainage districts or water districts
7. County conservation boards
8. County boards of health
9. Local Boards of Health
10. County boards of social welfare
11. Area vocational schools and community colleges
12. County public hospitals
13. Sanitary districts
14. County library districts
15. Townships

At this time, in reliance on the statements of the Assistant Attorney General, Nos. 8, 9, and 14 will be excluded on the ground that they have not purchased asphalt products. The remaining twelve political subdivisions shall be included within the class. It has been noted that the defendants suggest prospective members of the class not named by the Attorney General which may have equal right to inclusion. To provide for that contingency, the Court again emphasizes that this is a preliminary determination. Joinder of additional parties will be allowed if circumstances require.

The defendants' alternate motion sets forth a procedure for determining which political subdivisions actually will participate in the suit. Rule 23(c) (2) provides for inclusion of all members who do not request exclusion. The proposed procedure would preserve the right to elect not to be bound by the judgment in this case, but would require all political subdivisions desiring to participate to affirmatively state that intention in writing. The requested procedure would make an early determination of which parties intend to offer proof of damages, a matter which would require some notice to the Court and the defendants in any event. Rule 23(c) (2) does not prohibit the suggested procedure since the rule does not limit the matters that may be included within the notice. The authority to employ the requested procedure is implied in Rule 23(d). In Philadelphia Electric Company, et al v. Anaconda American Brass Company, et al, supra, the Court ordered that the first notice to the members should include a notice that members of the class not electing to file proofs of claim on or before a specified date would be forever barred. In Harris v. Jones, 41 F.R.D. 70 (D.Utah 1966), the Court provided for a second notice to accomplish this objective, stating:

"Within a reasonable time after a determination of exclusion from the class as a result of the foregoing notices, and with appropriate relationship to the prospective date of trial and the necessities of discovery, there will be a further notice directed to members of the class requiring them to file

simple statements of their claims upon furnished forms, particularly with reference to the types and sources of representation, if any, upon which they relied in purchasing their securities and the time they first learned any representations were false. An order will be made, and notice given, that if such statements without good cause are not filed within the time specified the action may be dismissed with prejudice as to defaulting members for failure diligently to prosecute. When the latter stage has been completed the court should be in a position better to determine the adequacy of the existing representation, more effectively to define the class or to establish practical guides for the trial of the cases and, it is hoped, the submission of the issues for meaningful determination by a jury."

The effect on members of the class of the two-notice procedure is the same as the requested procedure in that failure to act affirmatively would bar recovery. The Court believes that in the interests of expediency and fairness to the defendants, the notice of maintenance of a class action should include a provision requiring members to indicate in writing their intent to submit claims.

Accordingly, it is hereby ordered that all the motions by the defendants to dismiss the class action or to strike paragraphs 7, 8, and 9 of the Complaint are denied.

It is further hereby ordered that the alternate motion for an Order limiting the class of plaintiffs is sustained except as it relates to the time allowed for filing a written statement.

The Liaison Committee heretofore appointed by this Court are directed to submit to the Court within ten (10) days from receipt of this Order a proposed form of notice which will meet the requirements of Rule 23(c) (2) and this Order. The form of notice shall allow sixty (60) days for members of the class 'to file a written statement.

## ON MOTIONS TO SUPPRESS EVIDENCE

These rulings are predicated upon motions to suppress evidence.

The circumstances which gave rise to these motions are as follows: On December 5, 1966, representatives of the Iowa Attorney General entered the Des Moines offices of Bitucote Products Co., Bituminous Material & Supply Co., Pioneer Asphalt Co., and Central States Oil & Asphalt Co., Inc. for the purpose of searching through and impounding certain business records. These actions were purportedly authorized by Court Orders signed by an Iowa District Court Judge. The applications for the Court Orders request "an Order authorizing applicant to impound, take custody and remove from the premises all records, books, correspondence, documents, and accounts of [each of the above-named defendants] and keep them in his possession until the completion of the proceedings pursuant to Chapter 438, Acts of the 61st General Assembly." The applications were signed by an Assistant Attorney General. All of the offices were entered by groups of men which included Assistant Attorneys General and law enforcement officers. The men proceeded to search throughout the offices, in one instance gaining access to the documents by employing a locksmith, and eventually hauled away file cabinets and desk drawers containing substantially all of the business records contained in the offices. On the following day, the Complaint in this case was filed against the four companies whose records had been seized and numerous other defendants.

It appears that at no time prior to or after the searches and seizures herein described were any legal actions instituted against the defendants pursuant to Chapter 438, Acts of the 61st General Assembly. (Iowa Code Section 713.24 (1966). Moreover, the defendants contend that such actions were never seriously considered by the plaintiffs and that the sole purpose of the seizures was to obtain information to be used in this case. The defendants urge the Court

to find that the Attorney General's representatives violated state and federal constitutional guarantees against unreasonable searches and seizures in that their acts were not authorized by a valid court order and were carried out in an unreasonable and oppressive manner. The remedy sought is an order suppressing all evidence obtained in the search, preventing use of any information derived from the search, and requiring the return of all documents and all copies of documents seized by the State of Iowa.

Pioneer Asphalt Co. and Central States Oil & Asphalt Co., Inc., joined in one motion to suppress, setting out grounds for suppression and supporting the motion with exhibits and affidavits, while Bitucote Products Co. and Bituminous Material & Supply Co. each filed such motions of their own. The motion by each of these defendants has been joined in and adopted by substantially all of the other defendants in this case.. Thus, the Court is requested to prevent use of allegedly tainted evidence not only against the parties whose records were seized but also against the other defendants.

The plaintiffs in this case are the State of Iowa, the Iowa State Highway Commission, and every other political subdivision of the State of Iowa. Inclusion of the political subdivisions has been disputed by the defendants by motions to dismiss the class action or to strike. Since those motions have now been overruled, any suppression Order resulting from the actions of the Assistant Attorneys General will apply to all members of the class. If it is found that the searches and seizures were illegally carried out to aid in preparation of this case, the consequences must be borne by all because the Assistant Attorneys General were preparing this case in behalf of all plaintiffs.

In general, the test to be applied in determining whether searches and seizures are unreasonable is "whether the thing done, or attempted to be done, in sum of its form, scope, nature, incidents and effect, impresses as being fundamentally unfair or unreasonable in the specific situation when the immediate end sought is considered." Schwimmer v. United States, 232 F.2d 855 (8th Cir.), cert. den. 352 U.S. 833, 77 S.Ct. 48, 1 L. Ed.2d 52 (1956); State v. Hagen, 258 Iowa 196, 137 N.W.2d 895 (1965). The test is the same under both Article I, Section 8 of the Iowa Constitution and the Fourth Amendment. In applying the test to the facts of this case, the first matter to be considered is the validity of the Court Orders purporting to authorize the searches and seizures. The Orders are subject to attack on two grounds: that no actions were to be commenced under Section 713.24 of the Iowa Code, and that, even if such actions were contemplated, the statute does not authorize searches and seizures of the kind accomplished. The statute in question deals with consumer frauds in the advertising and sale of merchandise. The portions of the statute relied on by the State of Iowa in seeking the Court Orders provide that the Attorney General may:

"Examine any merchandise or sample thereof, record, book, document, account or paper as he may deem necessary." (Section 713.24 (3) (c))

"Pursuant to an order of district court impound any record, book, document, account, paper or sample of merchandise that is produced in accordance with this section, and retain the same in his possession until the completion of all proceedings in connection with which the same are produced." Section 713.24 (3) (d).

The possibility cannot be precluded that an action under this statute could have been started against the four companies in December of 1966 or some time thereafter. There is virtually no evidence, however, to show that the State of Iowa ever intended to take any action under the statute except to seize the records. Former Attorney General Scalise testified that nothing more was done, but also stated: "I assume the matter is still open, however, in the event the new Attorney General wishes to pursue

it." (Defendants' Exhibit 2, p. 63). On the other hand, former Assistant Attorney General Nolden I. Gentry testified that the purpose in seeking the Orders for the impounding of the documents was to inspect them for use in this case. (Defendants' Exhibit 2, p. 330). Statements made by one of the attorneys who originated the applications for the Orders clearly indicate this purpose. (Defendants' Exhibit 1, pp. 34, 43, 45). The exhibits also show that the seized documents were examined and copied for use in this case. In addition, the fact that more than a year has passed since the records were seized without any further action under the state statute is strong evidence in favor of the defendants' contention. Anyone familiar with the facts could hardly arrive at any conclusion but that the plaintiffs used the statute for a purpose not intended by the Legislature. The proof of this is more than a preponderance; it is clear and convincing.

■■■ There is little room for doubt that the statute itself does not authorize such extensive searches and seizures under any circumstances. As the defendants point out in their brief, the statute provides for notice and hearing and the issuance of subpoenas in order to accomplish its objectives. The subsection providing for a court order to impound refers to materials *"produced* in accordance with this section." While the investigative powers conferred upon the Attorney General by the statute are considerably broader in scope than those available to him in a criminal prosecution, the statute cannot be construed to authorize the sweeping searches and seizures made in this case. The Court has no doubt that the Order would not have been issued if the motives of the applicants had been disclosed.

■ It is on two separate grounds that this Court finds the Court Orders invalid. There is no need to go further in finding the searches and seizures unreasonable and violative of Article I, Section 8 of the Iowa Constitution and of the Fourth Amendment. Only in a carefully defined class of cases is a search without proper consent reasonable. See See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 723 (1964); Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). There is more than lack of consent, however, which makes the illegal conduct unreasonable in this instance. The courts have found the Constitution to have been breached where the harm resulting from an illegal search appears slight in comparison. In this instance, not only were the searches and seizures carried out without regard to the interference in the business activities of the defendants, but they constituted an abuse of government power that is clearly offensive to a sense of justice. The grievous consequences of the government becoming a lawbreaker are sufficiently stated in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). The abuse of power is especially reprehensible where, as here, the government enlists the aid of statutes and deceives a court to carry out its illegal objective.

Concluding as it does, that the constitutional guarantees against unreasonable search and seizure have been breached, the Court must now determine whether the remedy of suppression is available in a civil case such as this. It is said that this is a question upon which the Supreme Court has not passed and the Courts of Appeals are divided. The Courts which have extended the remedy to civil cases have placed considerable reliance on cases involving forfeiture of property used in the commission of a crime. It is made clear in this type of case that illegally seized evidence cannot be used to prove the violation causing the forfeiture, but the proceeding against the property itself is not a criminal case and some dispute existed as to the use of a suppression order in a civil action. The matter has been settled by the decision in One 1958 Plymouth Sedan v. Com. of

Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), wherein it is stated:

" * * * a forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law. * * * It would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible. That the forfeiture is clearly a penalty for the criminal offense and can result in even greater punishment than the criminal prosecution has in fact been recognized by the Pennsylvania courts."

▮▮▮ The Court in *Plymouth Sedan* emphasized the quasi-criminal nature of the proceedings. The principle set out in the quotation above applies with equal force to the present case. An action for treble damages under the antitrust laws is also quasi-criminal. See, e. g., United States v. Borden Co., 347 U.S. 514, 74 S. Ct. 703, 98 L.Ed. 903 (1954); Kinnear-Weed Corp. v. Humble Oil & Ref. Co., 214 F.2d 891 (5th Cir. 1954), cert. den., 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1955); United States v. Standard Ultramarine & Color Co., 137 F.Supp. 167 (S.D.N.Y.1955). The matters which must be proved by the plaintiffs are the same matters which must be proved in a criminal proceeding against the defendants. There is a possibility that criminal proceedings may be commenced. If the defendants were found guilty, the penalty imposed could be considerably less than the amount of damages ' requested in the present case.

It may be argued that a distinction exists between a forfeiture proceeding and a private antitrust suit in that the former always involves enforcement of laws by government officials. The remedy of suppression seems more necessary to curb excesses of government officials who have the ability to coerce and the opportunity to conduct illegal seizures. While it is true that the Government in this case is in the position of a private party bringing suit under the Sherman and Clayton Acts, the uncertainty over the applicability of the exclusionary rule in cases not involving government officials is not pertinent here. In bringing the suit, the Attorney General was fulfilling the duties of his office and his representatives acted in furtherance of ends within the scope of their duties. By improperly availing themselves of statutory powers granted only to the Attorney General in his official capacity, the plaintiffs have subjected themselves to the impact of the exclusionary rule as a remedy against arbitrary acts of governments insofar as the rule applies to civil cases.

▮▮▮ The conclusion that suppression of illegally seized evidence is a proper procedure in a civil case is supported by the following decisions: Rogers v. United States, 97 F.2d 691 (1st Cir. 1938); United States v. Blank, 261 F.Supp. 180 (N.D.Ohio 1966); Lassoff v. Gray, 207 F.Supp. 843 (W.D.Ky.1962); Carlisle v. State Ex rel. Trammell, 276 Ala. 436, 163 So.2d 596 (1964); Carson v. State Ex. rel. Price, 221 Ga. 299, 144 S.E.2d 384 (1965); Del Presto v. Del Presto, 92 N. J.Super. 305, 223 A.2d 217 (Super.Ct. 1966); Williams v. Williams, 8 Ohio Misc. 156, 221 N.E.2d 622 (Com.Pleas 1966). In United States v. Blank, supra, a civil action for assessment of taxes, the Court ordered suppression of illegally seized evidence stating that "Our decision today follows necessarily from the reasoning explicitly expressed by the Supreme Court in One 1958 Plymouth Sedan v. Com. of Pennsylvania." Similarly, the decisions in the three state cases above relied on the Plymouth Sedan case.

Support for this conclusion may also be found in statements of the Supreme Court such as that in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914): "This protection reaches all alike, whether accused of

crime or not * * *." Also, in Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1959), Mr. Justice Brennan dissented from the majority's finding that a search had not been unconstitutional and made the following statement:

"We are told that the governmental power to make a warrantless search might be greater where the object of the search is not related to crime but to some other 'civil' proceeding—such as matter bearing on the issue whether a man should forcibly be sent from the country. The distinction is rather hollow here, where the proofs that turn up are in fact given in evidence in a criminal prosecution. And the distinction, again, invites a trial of the officers' purposes. But in any event, I think it perverts the Amendment to make this distinction. The Amendment states its own purpose, the protection of the privacy of the individual and of his property against the incursions of officials: the 'right of the people to be secure in their persons, houses, papers, and effects.' See Boyd v. United States, 116 U.S. 616, 627, [6 S.Ct. 524, 530, 29 L.Ed. 746.] Like most of the Bill of Rights it was not designed to be a shelter for criminals, but a basic protection for everyone; to be sure, it must be upheld when asserted by criminals, in order that it may be at all effective, but it 'reaches all alike, whether accused of crime or not.' Weeks v. United States, supra, at [232 U.S. at page] 392, [34 S.Ct. at page 344, 58 L.Ed. 652.] It is the individual's interest in privacy which the Amendment protects, and that would not appear to fluctuate with the 'intent' of the invading officers. It is true that the greatest and most effective preventive against unlawful searches that has been devised is the exclusion of their fruits from criminal evidence, see Weeks v. United States, supra; Boyd v. United States, supra; but it is strange reasoning to infer from this that the central thrust of the guarantee is to protect against a search for such evidence. The argument that it is seems no more convincing to me now than when it was made by the Court in Frank v. [State of] Maryland, 359 U.S. 360, [79 S.Ct. 804, 3 L.Ed.2d 877.] To be sure, the Court in Boyd v. United States, supra, and in subsequent cases has commented upon the intimate relationship between the privilege against unlawful searches and seizures. and that against self-incrimination. This has been said to be erroneous history; if it was, it was even less than a harmless error; it was part of the process through which the Fourth Amendment, by means of the exclusionary rule, has become more than a dead letter in the federal courts. Certainly this putative relationship between the guarantees is not to be used as a basis of a stinting construction of either—it was the Boyd case itself which set what might have been hoped to be the spirit of later construction of these Amendments by declaring that the start of abuse can 'only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.' 116 U.S., at 635, [6 S.Ct. 535.]"

The decisions in Camara v. Municipal Court of the City and County of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, supra, holding that search warrants must be obtained to inspect homes and business premises, may be taken to indicate that the right to be free from unconsented searches is the foremost concern of the Fourth Amendment and that the use of illegally seized evidence in a criminal prosecution is merely a common incident of the search which is proscribed. The cases extending the exclusionary rule to civil proceedings are based on the conclusion that it is the right of privacy that is protected and that there exists no valid distinction for varying the exclusionary rule in a civil case. In Hinchcliff v. Clarke, 230 F.Supp. 91 (N.D.Ohio 1963), rev'd. on other grounds, 371 F.2d 697 (6th Cir.

1967), the District Court pointed out that society's interest in proof obtained by illegal means is less in a civil case than in criminal cases in which the evidence is suppressed. This Court is persuaded that the evidence seized from the four defendants must be suppressed.

No distinction can be made based on the fact that commercial premises were illegally searched as opposed to residential premises. See See v. City of Seattle, supra; Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L. Ed. 374 (1931); Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct 182, 64 L.Ed. 319 (1920).

The defendants rely on Hinchcliff v. Clarke, supra, in urging that the illegally seized evidence be suppressed completely and the plaintiffs barred from reacquiring it by any means. Putting aside for the moment the question of reacquisition, the Court has no doubt that the plaintiffs are barred from profiting in any way by the illegal search and seizure. This is the unmistakable teaching of Silverthorne Lumber Co. v. United States, supra, wherein it is stated:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."

There is no dispute among the cases that the government cannot use the information obtained illegally either directly or indirectly to discover other evidence. To hold that the only prohibition should be against introduction of the evidence at trial would be an empty remedy and an inducement to the violation of constitutional rights. While the Silverthorne case and the other cases establishing this principle were criminal proceedings, there is no rational basis for varying the rule in a civil case.

 The question of reacquisition of the evidence has not been decisively settled by the cases in point. Part of the

answer is supplied by Mr. Justice Holmes' statements in the Silverthorne case:

> "Of course this does not mean that facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like many others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed."

This principle has not been altered by subsequent cases and must be applied to the present case. It is clear then that information illegally obtained can be used if it is later gained from an independent source. It seems likely that most of the relevant documents and information obtained illegally in this case would in normal circumstances be discoverable under the rules of discovery applicable in civil cases. Have the plaintiffs forfeited the right to make use of discovery procedures to regain the previously seized documents or the information contained in them? The statement of Mr. Justice Holmes does not resolve this issue. Subsequent legal means of acquiring the documents could well be considered "independent" of previous illegal means.

In Hinchcliff v. Clarke, supra, the Court ruled unequivocally that illegally obtained evidence could not be reacquired by any means. The Court in Hinchcliff reasoned that to hold otherwise would reduce the suppression Order to a futile gesture and added that the scope of its Order was discretionary, saying that,

> "This Court, being a court of equity as well as a court of law, has the power to fashion an appropriate order which will achieve the ends of justice."

Were this Court to view the matter as discretionary only, it could base its decision on the equities of the case without further consideration of whether complete suppression is constitutionally compelled. There are cases contrary to Hinchcliff which, by a preponderance of numbers as well as by greater persua-

siveness, lead this Court to deny complete and permanent suppression.

In Lord v. Kelley, 223 F.Supp. 684 (D. Mass.), appeal dismissed, 334 F.2d 742 (1st Cir. 1964), the Court refused to prohibit reacquisition by an appropriate summons to produce on the ground that the complainants should not be better off than before the unlawful seizures. The Court stated:

"If it be argued that the Internal Revenue Service should be taught a lesson and penalized for Flattery's misconduct, there are many answers, of which the best is that exclusionary rules of evidence are designed not as punishment but to prevent the public prosecutor from using 'dirty hands' to achieve a conviction."

"* * * while the complainants may be disappointed that they have not won immunity, they have vindicated the right of an independent accountant's clients not to have their papers seized by arbitrary, high-handed methods of tax enforcement."

The Appellate Court in Lord v. Kelley characterized the ruling in Hinchcliff as a penalty, indicating that the reasons for the ruling were that the wrongful seizure had put the taxpayers to great expense, that the fact that the taxpayers wanted the documents back might of itself cause the government to believe that they were not innocent, that to rule otherwise would give the taxpayers but a "hollow victory" and finally, that the U. S. Attorney there showed no contrition.

Other cases have also approved the principle that when knowledge of documents is gained independent of an illegal search and seizure the documents can be obtained by legal means. See McGarry's, Inc. v. Rose, 344 F.2d 416 (1st Cir. 1965); Wagman v. Arnold, 257 F.2d 272 (2d Cir. 1958); United States v. Sheba Bracelets, 248 F.2d 134 (2d Cir. 1957), cert. den. 78 S.Ct. 330, 355 U.S. 904, 2 L.Ed.2d 259 (1957); United States v. Mahler, 254 F.Supp. 581 (S.D. N.Y.1966); Cf. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1962); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). While in some of these cases the government knew of the documents before they were seized, this is not a significant distinction where, as in this case, the plaintiffs could have used the civil rules of discovery to learn of the existence of relevant documents.

Looking to the factors considered in Lord v. Kelly, as weighing in favor of a limited suppression order, it is well to point out here that the government has tacitly admitted wrongdoing, that the illegal method of gaining access to the corporate records was unique and will not soon occur again, and that the defendants have vindicated the right to be free from misuse of statutes as a means of violating constitutional rights. A limited suppression order is far short of immunity but it is not a futile gesture. The relief to be granted in this case complies with the exclusionary rules as they now stand. In some cases a limited suppression order is of great benefit to the complainant while in others the impact is less. It is not the duty or the inclination of this Court to ensure the greatest effect. The defendants will be restored to their earlier position but will not gain immunity. In ruling on any discovery motions by the plaintiffs, the Court will take care to prevent, insofar as possible, the use of illegally obtained information.

Another significant issue raised by the motions to suppress is the question of standing. It must be determined whether the right to move for suppression belongs only to the four defendants whose records were seized or whether it extends to their codefendants as well. Implicit in this choice is the certainty that if the right belongs only to the four corporations, each has standing only to move for suppression of the evidence seized from it. In resolving this matter, reliance must again be placed on exclusionary rule as it has been developed in criminal cases.

 It is clear that illegally seized evidence may not be used against codefendants in a criminal case but the rule is limited to a situation of joint trial. See McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Gillespie v. United States, 368 F.2d 1 (8th Cir. 1966); Schoeneman v. United States, 115 U.S.App.D.C. 110, 317 F.2d 173 (1963); Hair v. United States, 110 U.S.App.D.C. 153, 289 F. 2d 894 (Cir. 1961). Heretofore in this ruling where criminal cases have been relied upon in applying the exclusionary rule to civil proceedings, the purpose has been to derive from them that which is an integral part of constitutional rights. The Court believes, however, that the rule of exclusion applied in the cases just cited is compulsive only in criminal cases. It is apparent from Rule of Criminal Procedure 41(e) that the government may in certain situations use illegally seized evidence against persons who were not personally subjected to an illegal search and seizure. Evidence wrongfully seized from one person may be used against his alleged partner in crime if the two are tried separately. See United States v. Beigel, 370 F.2d 751 (2d Cir. 1967); United States v. Granello, 365 F.2d 990 (2d Cir. 1966); United States v. Konigsberg, 336 F.2d 844 (3d Cir. 1964); Cf. United States v. Chieppa, 241 F.2d 635 (2d Cir. 1957). The protections given to codefendants in criminal cases by the McDonald case can be attributed to the need for more stringent safeguarding of the rights of persons accused of crime. The prohibitions against self-incrimination, deprivation of legal counsel, cruel and unusual punishment and the right to confrontation of witnesses and a jury trial are likewise examples of protection having less applicability to defendants in civil proceedings. The McDonald case and the cases following it have established an exception to the requirement of standing to object but is an exception peculiarly applicable to criminal cases.

Accordingly, it is hereby ordered that the motions to suppress made by Pioneer Asphalt Co., Central States Oil & Asphalt Co., Inc., Bitucote Products Co. and Bituminous Material & Supply Co. are granted insofar as each of these parties has moved to suppress evidence seized from it. The plaintiffs are ordered to return all items seized from these defendants together with all copies made from the seized items. It is further ordered that the plaintiffs may not in any manner use the seized items or any knowledge gained by the illegal searches against the party from whom the knowledge was gained or the items seized, except that the plaintiffs may make use of all evidence and knowledge if it is gained from an independent source.

It is further ordered that all other motions to suppress are denied.